EL PUEBLO DE PUERTO RICO, apelado, *v.* HERIBERTO CA-
RRASQUILLO MORALES, c/p ROBERTO RIVERA NIEVES,
apelante.

*Número:* CR-86-86 *Resuelto:* 23 de mayo de 1989

*Carmen Ana Rodríguez Maldonado, Ivette Aponte Nogueras* y *Enrique Rivera Mendoza,* de la *Sociedad para Asistencia Legal, División de Apelaciones,* abogados del apelante; *Norma Cotti Cruz, Subprocuradora General,* y *Nilda P. Fuentes Ortiz, Procuradora General Auxiliar,* abogadas de El Pueblo.

EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ emitió la opinión del Tribunal.

El apelante Heriberto Carrasquillo Nieves, c/p Roberto Rivera Nieves, solicita la revocación de una sentencia de diez (10) años de reclusión que le fuera impuesta por el Tribunal Superior de Puerto Rico, Sala de San Juan, luego de que fuera declarado culpable y convicto por dicho foro —en juicio celebrado por tribunal de derecho— en relación con un pliego acusatorio en que el Estado le imputó una violación al Art. 401 de la Ley de Sustancias Controladas de Puerto Rico, 24 L.P.R.A. sec. 2401, esto es, poseer con la intención de distribuir la sustancia controlada conocida como *heroína.*

En apoyo de la solicitud de revocación de la sentencia apelada, se le imputa al foro de instancia haber errado "al admitir prueba sobre la cual no se estableció la cadena de evidencia" y al declararlo culpable "sin que se estableciera

su culpabilidad más allá de duda razonable". Alegato, pág. 16.

I

El primer señalamiento de error hace necesario que se analicen, *en detalle*, los testimonios prestados durante el proceso celebrado a nivel de instancia por los testigos de cargo, José R. Velázquez Sánchez y Ernesto Laboy Escobar —ambos agentes de la Policía de Puerto Rico adscritos a la División de Drogas y Narcóticos— *en específico, el vertido por el agente Laboy Escobar.*

Conforme la declaración de Velázquez Sánchez —quien para la fecha de los hechos hacía dos (2) años que trabajaba en la citada División de Drogas— como a las 4:00 P.M. del día 7 de marzo de 1985 pudo observar, desde un automóvil oficial no rotulado en que viajaba en compañía de otros tres (3) agentes, a dos (2) individuos que estaban parados, frente a frente, en la calle Cisne del Residencial López Sicardó, Río Piedras, Puerto Rico, mientras llevaban a cabo una transacción que, según su experiencia, envolvía narcóticos. El agente Velázquez Sánchez específicamente observó, a una distancia de diez (10) a doce (12) pies, a una de las personas entregándole dinero a otra —el apelante— la cual tenía en sus manos una bolsa plástica transparente que contenía varias envolturas en papel blanco que normalmente se utilizan en el trasiego de narcóticos. Al percatarse de lo anterior, el agente Velázquez Sánchez le solicitó al conductor del vehículo que lo detuviera, se bajó del mismo, procediendo a identificarse como agente del orden público. Tanto el apelante como la otra persona "emprendieron carrera" persiguiendo el agente Velázquez Sánchez al apelante, logrando darle alcance como a una distancia de veinticinco (25) a treinta (30) pies del lugar desde donde originalmente se en-

contraban.(1) El agente del orden público procedió al arresto del apelante, ocupando la bolsa plástica transparente de referencia; *dentro de la misma, a su vez, ocupó quince (15) envolturas de papel celofán encerado, "a manera de 'decks'", los cuales tenían "unos diseños en colores" y contenían un polvo blanco en su interior.*(2) El arrestado se identificó como Roberto Rivera Nieves.

El agente Velázquez Sánchez testificó que inició —con las iniciales J.R.V.— tanto la *bolsa grande transparente como las quince (15) envolturas pequeñas, procediendo a entregarle toda dicha evidencia al agente Laboy Escobar en las oficinas de la División de Drogas y Narcóticos como a eso de las 4:40 P.M. del día de los hechos.*(3) Declaró, en adición, que luego de que el agente Laboy Escobar hiciera la "prueba de campo" en la División, la cual arrojó positivo de heroína, *procedieron a colocar dicha evidencia en un sobre —el cual tenía el número de identificación 25966— y ambos firmaron dicho sobre,* permaneciendo el mismo en poder de Laboy Escobar. *El agente Velázquez Sánchez identificó en corte abierta, tanto la bolsa grande transparente, como las quince (15) envolturas, como el sobre en que se guardaron las mismas,* principalmente a base de sus iniciales.

Por su parte, el agente Laboy Escobar, al ser interrogado por el Ministerio Público sobre los hechos del 7 de marzo de 1985, declaró, en síntesis y en lo pertinente, que:

> . . . [E]n relación a este caso honestamente no sabe, *que no recuerda la fecha exacta.* Que con relación a este caso recibió una evidencia, pero que como no ha revisado su declaración jurada y hace tanto tiempo, *no recuerda la fecha. . . .* [Q]ue

---

(1) La otra persona —con quien alegadamente el apelante realizaba la transacción de drogas— *no* pudo ser arrestada.

(2) Al apelante le fue ocupada, en adición, la suma de $115 en efectivo.

(3) El agente Laboy Escobar era uno de los tres (3) agentes que acompañaban al agente Velázquez Sánchez el día 7 de marzo de 1985.

recibió la evidencia del Agente José R. Velázquez [y] le practicó la prueba de campo[,] la cual dio positivo, y luego la llev[ó] al laboratorio de la Policía. . . . [L]e hizo la prueba de campo a la evidencia y el resultado se plasm[ó] en un documento. Que este documento él lo pone en un sobre junto con la evidencia ocupada. Dice que llev[ó] el sobre de evidencia al laboratorio de la policía *pero no recuerda a qui[é]n se lo dio*. Señala que se lo dio a un químico, pero no recuerda su nombre.

. . . . . . . . .

. . . [N]o recuerda la fecha de los hechos . . . . *Tampoco recuerda la fecha en que le entregaron la evidencia relacionada con el caso de autos.*

[R]econoce el documento [el de la prueba de campo] po[rq]ue es su letra . . . . *No recuerda la fecha en que preparó el documento.* Recuerda que la prueba dio positivo . . . . *No se acuerda si fue positivo a cocaína, honestament[e] no se acuerda.*

. . . . . . . . .

. . . *Que de las quince envolturas s[ó]lo le hizo la prueba de campo a una de ellas.*

. . . . . . . . .

. . . [Q]ue una vez cerró el sobre de evidencia lo coloc[ó] en un *"locker", pero que no recuerda si fue en el "locker" de él o en el del mismo compañero, ya que para aquel tiempo no recuerda si le habían asignado "locker". No recuerda si en este "locker" había otra evidencia.* Pero que el sobre fue dejado en un "locker" en la División de Drogas. *Allí permaneció la evidencia, no sabe si hasta el otro día o durante esa semana hasta que la pudo lleva[r] al laboratorio.* Llev[ó] la evidencia al laboratorio . . . y se la entreg[ó] al [q]uímico. *No recuerda qui[é]n es el [q]uímico.* (Énfasis suplido y en el original.)[4]

A pesar de que el agente Laboy Escobar identificó en corte abierta el documento donde plasmó el resultado de la prueba de campo y el sobre donde alegadamente se guardó

---

[4] Véase E.N.P., págs. 19–24.

la evidencia —por contener ambos su firma— a preguntas de la defensa declaró:

> Que el *procedimiento normal* es que el agente que recibe la evidencia hace la prueba de campo, deposita la evidencia en el sobre y luego llena la car[á]tula del sobre.
>
> ... [L]o escrito en *la parte del sobre donde se describe la evidencia ocupada no es su letra.*[5]
>
> .　　　.　　　.　　　.　　　.　　　.　　　.　　　.
>
> ... Que el que echa la evidencia en el sobre se supone que es el que llene la información en el sobre, pues tiene que estar seguro de lo que las cantidades que indica el sobre y la que esté en su interior concuerden. *Que en este caso no fue así.* (Énfasis suplido.)[6]

Debe señalarse, por último, que según ello surge de la exposición narrativa de la prueba certificada como correcta por el tribunal de instancia en el presente caso las partes, con la anuencia del tribunal de instancia, estipularon "el análisis químico en el sentido de que de venir a declarar el químico declararía el contenido del documento. Pero no se estipul[ó] la cadena de evidencia".[7]

Surge del informe suscrito por el Químico Rafael Martínez Rosa, el cual fuera admitido en evidencia, que:

Memorando A:　Mariano Maeso González
　　　　　　　　Director Laboratorio Criminal
　　　　　　DE:　Rafael Martínez Rosa
　　　　　　　　Químico
　　　ASUNTO: ANALISIS DE MUESTRA SOMETIDA

Siguiendo sus instrucciones he realizado un análisis a la muestra sometida por el Agente Ernesto Laboy 7921. Esta muestra fue sometida el día 8 de marzo de 1985, a las 2:30 P.M. Análisis solicitado por el Agente José R. Velázquez 1584.

---

[5] Véase E.N.P., págs. 24–25.

[6] Véase E.N.P., pág. 26.

[7] Véase E.N.P., pág. 27.

A continuación se describe la misma y se indica el resultado del análisis practicado:

DESCRIPCION DE EVIDENCIA:

Una (1) bolsa plástica transparente, con cierre de presión, que contiene quince (15) bolsas de celofán, cogidas con cinta adhesiva transparente; once (11) de estas con el dibujo de una carita de color azul, dos (2) con el dibujo de un león de color anaranjado, una (1) con el dibujo de un mono de color rojo y la última con el dibujo de un león de color anaranjado y un camello de color violeta, todas ellas conteniendo polvo blanco.

Sobre: 25966

RESULTADO DEL ANALISIS:

Mediante análisis químico practicado al polvo blanco de cada una de las bolsas de celofán, se determinó la presencia de HEROINA. Peso total del polvo: .2425 gramos.

Caso: ROBERTO RIVERA NIEVES
*Exhibit IV* del Pueblo, Informe de 8 de marzo de 1985.

## II

De entrada debemos señalar que la llamada "cadena de evidencia" no es más que una forma de satisfacer el requisito de autenticación que, como una condición previa a la admisibilidad de evidencia, establece la Regla 75 de Evidencia, 32 L.P.R.A. Ap. IV,[8] "mediante el testimonio de testigos con conocimiento personal sobre *la custodia o trayectoria* del objeto desde su ocupación hasta su presentación en el juicio o vista". (Énfasis suplido y en el original.) E.L. Chiesa, *Práctica Procesal Puertorriqueña: Evidencia*, San

---

[8] Dispone la Regla 75 de Evidencia: "El requisito de autenticación o identificación como una condición previa a la admisibilidad se satisface con la presentación de evidencia suficiente para sostener una determinación de que la materia en cuestión es lo que el proponente sostiene." 32 L.P.R.A. Ap. IV.

La Regla 76 de Evidencia, 32 L.P.R.A. Ap. IV, enumera varios ejemplos de autenticación.

Juan, Pubs. J.T.S., 1985, Vol. 1, Cap. X, pág. 489. P.C. Gian-nelli, *Chain of Custody and the Handling of Real Evidence,* 20 Am. Crim. L. Rev. 527, 532 (1983). Su "propósito es evitar error en la identificación del objeto y demostrar que la evidencia presentada no ha sufrido cambios sustanciales desde que fue ocupada el día de los hechos". *Pueblo v. Bianchi Álvarez,* 117 D.P.R. 484, 490 (1986).

▮▮▮ Nuestras Reglas de Evidencia, al igual que las reglas federales de donde fueron tomadas, tratan la autenticación o identificación como un asunto de "pertinencia condicionada".[9] Giannelli, ante, pág. 532. Es decir, la autenticación o identificación es una *condición de hecho* que es necesario establecer para demostrar *la pertinencia* de la evidencia real demostrativa que se ofrece en evidencia. De ahí que la evidencia demostrativa real requiera una *determinación de pertinencia preliminar* a su admisión en evidencia bajo la Regla 9 de Evidencia, 32 L.P.R.A. Ap. IV. *Pueblo v. Bianchi Álvarez,* ante, págs. 490–491. El tribunal hace la determinación preliminar de admisibilidad a base del "testimonio de base" que se le presente, por lo cual es necesario que el proponente de la evidencia real demostrativa demuestre, mediante dicho "testimonio de base", la autenticidad y, por ende, la pertinencia de la evidencia en cuestión como condi-

---

[9] La Regla 9(B) de Evidencia (equivalente a la Regla 104(b) federal) que se refiere a "pertinencia condicional" dispone: "Cuando la pertinencia de evidencia ofrecida depende de que se satisfaga una *condición de hecho,* el tribunal la admitirá al presentarse evidencia suficiente para sostener la conclusión de que la condición ha sido satisfecha; el tribunal puede también admitir la evidencia sujeto a la presentación posterior de la evidencia suficiente para sostener la conclusión de que la condición ha sido satisfecha." (Énfasis suplido.) 32 L.P.R.A. Ap. IV.

Comentando la Regla federal de Evidencia 901(a) equivalente a nuestra Regla 75 expresó el Comité Asesor de las Reglas federales lo siguiente: "This requirement of showing authenticity or identity falls in the category of relevancy dependent upon fulfillment of a condition of fact and is governed by the procedures set forth in Rule 104(b)." Véase P.C. Giannelli, *Chain of Custody and the Handling of Real Evidence,* 20 Am. Crim. L. Rev. 527, 532 esc. 20 (1983).

ción previa a su admisión. *Pueblo v. Bianchi Álvarez*, ante, pág. 491.

 En relación al *quantum* de prueba necesario para establecer esta condición preliminar de pertinencia, en *Pueblo v. Bianchi Álvarez*, ante, pág. 492, señalamos que la misma "debe probarse con certeza razonable, con evidencia que produzca 'convicción moral en un ánimo no prevenido'" y que "[n]o es necesario que se excluya toda posibilidad de error" pues lo importante es que se pueda razonablemente "concluir que la evidencia ha sido *adecuadamente custodiada y salvaguardada*", y que convencido el tribunal de que no ha habido anormalidad que afecte la adecuada custodia de la evidencia, debe admitir la misma pues la cuestión de si el proponente de la evidencia ha probado una adecuada cadena de custodia *"se dirige al peso [mejor que] a la admisibilidad de la prueba"* y queda por tanto reservada para el juzgador de los hechos. (Énfasis suplido.)

 Conviene aclarar, sin embargo, que no todo tipo de evidencia real demostrativa requiere que se establezca su autenticidad por medio de una "cadena de custodia" como condición previa a su admisibilidad. Cuando se ofrecen en evidencia objetos que son fácilmente identificables, ya sea porque poseen unas características distintivas o porque tienen un número o marca particular, no es imprescindible establecer la cadena de custodia para su admisión en evidencia. Así, por ejemplo, cualquier objeto que tenga un número de serie, como un arma[10] o un billete,[11] puede ser identificado por el número; un objeto inscrito con las iniciales o marcas de un policía u otra persona puede ser identificado por dicha

---

[10] *Wolfe v. State*, 383 N.E.2d 317, 318 (Ind. 1978).

[11] *State v. Conley*, 288 N.E. 296, 300–301 (Ohio 1971); *Calderón v. United States*, 269 F.2d 416, 419 (10mo Cir. 1959).

marca, ya que la misma tiene el efecto de convertir el objeto en uno distinguible de los demás; una obra de arte puede ser identificada por sus características propias.[12] En otras palabras, el proponente de la evidencia podrá demostrar la autenticidad —y la pertinencia— de la misma sin que sea absolutamente necesario, o aunque no pueda, demostrar la custodia o trayectoria exacta y precisa que tuvo dicha evidencia.

■ Por otro lado, existen situaciones en que, como *regla general*, el proponente de la evidencia *vendrá obligado* a probar la "cadena de custodia" para lograr la admisibilidad de la misma. A manera de ejemplo, podemos mencionar las siguientes: (1) cuando se ocupan objetos que contienen evidencia de naturaleza fungible —líquidos,[13] polvos,[14] píl-

---

[12] Para una discusión general de las circunstancias en que se requiere y no se requiere establecer una cadena de evidencia, véase Giannelli, ante, págs. 535–538.

[13] Véase *State v. Limerick*, 169 N.W.2d 538, 542 (Iowa 1969). Se señala que en el caso de líquidos y otras sustancias que pueden ser fácilmente alterados es necesario demostrar *la continua custodia* de los mismos para lograr su admisión en evidencia.

[14] *Graham v. State*, 255 N.E.2d 652, 655 (Ind. 1970). En este caso un informante entregó a agentes de la Policía una envoltura de papel metálico conteniendo ·un polvo blanco que recibiera de manos del apelante. Los agentes marcaron la envoltura con sus iniciales inmediatamente y la llevaron al cuartel de la Policía. Un análisis químico realizado posteriormente del contenido de la envoltura dio positivo de heroína. El apelante cuestionó la admisión en evidencia del resultado de dicho análisis aduciendo que no se probó adecuadamente la cadena de custodia desde el momento en que la evidencia fue depositada en el almacén de la Policía hasta que fue analizada. Acogiendo dicho planteamiento y revocando la *convicción expresó* el Tribunal:

"The danger of *tampering, loss, or mistake* with respect to an exhibit is greatest where the exhibit is small and is one which has physical characteristics fungible in nature and similar in form to substances familiar to people in their daily lives. *The white powder in this case could have been heroin, or it could have been for example, baking powder, powdered sugar, or even powdered milk.* The burden on the state in seeking to admit such evidence is clear. Unless the state can show by producing records or testimony, *the continuous whereabouts of the exhibit at least between the time it came into their possession until it was laboratory tested to determine its composition*, testimony of the state as to the laboratory's findings is inadmissible." (Énfasis suplido y en el original.) ·

doras,(15) etc.— cuyo contenido está en controversia y, a dife-
rencia del envase o envoltura en que se encuentra, resulta
imposible de marcar o identificar; (2) cuando, no obstante no
ser fungible, la evidencia ocupada no tiene características
únicas que la distingan de objetos similares y resulta, igual-
mente, imposible de marcar o, pudiendo ser marcada, ello no
se hizo, y (3) cuando la condición del objeto es lo relevante
—películas, grabaciones,(16) etc.— y el mismo es fácilmente
susceptible de alteración. E.W. Clearly, *McCormick on Evi-
dence*, 3ra ed., Minnesota, Ed. West Publishing Co., 1984,
Cap. 21, Sec. 212, págs. 667–668;(17) J.A. Tarantino, *Trial*

---

(15) *State v. Conley*, 288 N.E.2d 296, 300 (Ohio 1971). Se trataba de unas
píldoras cuyo análisis químico reveló eran "LSD". Al considerarse la admisibili-
dad en evidencia de las píldoras así como el resultado de su análisis químico se
señaló:
". . .[W]here the objects are more or less interchangeable and have no special
characteristics, the problem of establishing identity usually involves some evi-
dence as to a chain of custody. . . . One white pill looks much like any other white
pill and hence positive identification simply by observation is usually impossible.
To identify a particular item of this t[y]pe as being part of a pertinent incident in
the past usually requires the showing *of a continuous chain of custodians* up to
the material moment." (Énfasis suplido.)

(16) Véase *United States v. Johnson*, 696 F.2d 115, 124 (Cir. D.C. 1982),
donde se discute la facilidad con que las cintas magnetofónicas pueden ser alte-
radas o editadas y la dificultad de detectarlo. También *United States v. Gigante*,
538 F.2d 502, 505 (2do Cir. 1976).

(17) En cuanto a la necesidad de establecer una "cadena de custodia" para la
admisiblidad de evidencia señala McCormick en términos generales lo siguiente:
"If the offered item possesses characteristics which are fairly unique and
readily identifiable, and if the substance of which the item is composed is relative-
ly impervious to change, the trial court is viewed as having broad discretion to
admit merely on the basis of testimony that the item is the one in question and is
in a substantially unchanged condition. *On the other hand, if the offered evidence
is of such a nature as not to be readily identifiable, or to be susceptible to altera-
tion by tampering or contamination, sound exercise of the trial court's discre-
tion may require a substantially more elaborate foundation.* A foundation of the
latter sort will commonly entail testimonially tracing the 'chain of custody' of the
item *with sufficient completeness to render it improbable that the original item
has either been exchanged with another or been contaminated or tampered
with.*" (Énfasis suplido y escolios omitidos.) E.W. Clearly, *McCormick on Evi-
dence*, 3ra ed., Minnesota, Ed. West Publishing Co., 1984, Cap. 21, Sec. 212,
págs. 667–668.

*Evidence Foundations*, Santa Ana, James Publishing, 1986, Sec. 570, págs. 5–23. En todas estas situaciones, se requiere del proponente de la evidencia algo más que una "simple identificación" en corte abierta para establecer la autenticidad y pertinencia de la misma y lograr su admisión en evidencia; dicho objetivo se alcanza probando la cadena de custodia.[18]

■ El caso que nos ocupa es uno demostrativo de la primera de las situaciones antes mencionadas, ya que el objeto o evidencia ocupada contiene una sustancia (polvo) que es objeto de análisis y cuyo resultado pretende presentarse en evidencia. Dependiendo la pertinencia de dicha evidencia de que la sustancia analizada haya sido la misma que fue incautada, no es suficiente una mera identificación, ya sea por medio de marcas, iniciales, etc., en la envoltura donde estaba contenida la misma, hechas por la Policía al ser ocupada, pues ello solamente establecería que el objeto presentado en corte fue incautado por la Policía pero no que su *contenido* al momento de la incautación fue la evidencia analizada en el laboratorio. Así lo sostuvimos en el citado caso de *Pueblo v. Bianchi Álvarez*, ante, pág. 493, donde expresamos que, en relación con la admisión en evidencia del *resultado de la prueba científica practicada*, era necesario que el proponente estableciera que la sustancia contenida en la evidencia ocupada era la misma que fue objeto de análisis; *esto es, que dicha sustancia o contenido no fue cambiada, ni alterada, ni contaminada antes de que se sometiera al correspondiente análisis. A esos efectos, específicamente resolvimos que ello requiere que se presente prueba de la "adecuada custodia y cuidado" de la evidencia y su contenido desde su ocupación al momento de los hechos hasta que ese contenido*

---

[18] Giannelli, ante, pág. 537.

es *"analizado en el laboratorio de la Policía".* (Énfasis suplido.)[19]

## III

Con lo anteriormente expresado en mente, analicemos los hechos del presente caso. No cabe la menor duda de que *el sobre* y *las quince (15) envolturas* que el agente Velázquez Sánchez ocupara en la persona del apelante, el día 7 de marzo de 1985, es el *mismo sobre* y las *quince (15) envolturas* que fueron presentadas en evidencia durante el proceso que fuera celebrado a nivel de instancia. Ello es así por cuanto el agente Velázquez Sánchez, luego de ocupar dicha evidencia, *inició* tanto el sobre como cada una de las quince (15) envolturas, y éste, en el proceso celebrado, reconoció sus iniciales en dicha evidencia, despejando así cualquier duda sobre ese hecho.

La controversia surge en cuanto a la admisibilidad en evidencia del *resultado* del análisis químico que practicara el químico de la Policía de Puerto Rico, Rafael Martínez Rosa, en relación con el *contenido* de las quince (15) envolturas que, según su informe, fueron recibidas por él, de manos del agente Laboy Escobar, el 8 de marzo de 1985 a las 2:30 P.M.; controversia debida, principalmente, al testimonio "vacilante y evasivo" prestado por el agente Laboy Escobar sobre el "paradero o ubicación" de dichas envolturas desde el momento en que las recibió de manos del agente Velázquez Sánchez hasta que hizo entrega de las mismas al químico Martínez Rosa. A la luz de lo resuelto en *Pueblo v. Bianchi Álvarez,* ante, debemos resolver si el Estado demostró satisfactoriamente que *el contenido* de la evidencia en controversia fue objeto de una "adecuada custodia y cuidado" desde

---

[19] *Pueblo v. Bianchi Álvarez,* 117 D.P.R. 484, 493 (1986).

que la misma fuera ocupada el día de los hechos hasta el momento en que dicho contenido fue objeto de análisis con el propósito de llegar a la conclusión o "convicción moral en un ánimo no prevenido" de que se trata de la *misma* evidencia, esto es, que dicho contenido no fue cambiado, alterado o contaminado.

La declaración, que sobre este aspecto del caso prestara el agente Laboy Escobar durante el proceso que se le celebrara al apelante a nivel de instancia, resulta ser de vital importancia en la solución de la referida interrogante. Dicha declaración deja mucho que desear. Realmente resulta difícil aceptar que un agente del orden público de cierta experiencia, como lo es el policía Laboy Escobar, pueda declarar en la forma y manera en que lo hizo. Su testimonio causa inquietud y preocupación en nuestro ánimo sobre la razón o motivo que pueda haber estado tras semejante conducta y actitud de parte de un agente del orden público.

Como surge de la exposición narrativa de la prueba, certificada como correcta por el tribunal de instancia, el agente Laboy Escobar:

(a) no sabía ni recordaba la fecha exacta de los hechos, a pesar de que él participó en los mismos (E.N.P., pág. 19);

(b) no recordaba la fecha en que le entregaron la evidencia relacionada con el presente caso (E.N.P., pág. 20);

(c) de las quince envolturas, sólo le hizo la "prueba de campo" a una de ellas (E.N.P., pág. 22);

(d) sabe que dio positivo la misma porque tuvo que llevar la evidencia al laboratorio (E.N.P., pág. 21);

(e) no se acordaba de qué dio positivo la evidencia, si cocaína o heroína (E.N.P., pág. 21);

(f) no recordaba la fecha en que preparó el documento sobre la prueba de campo realizada (E.N.P., pág. 20);

(g) no fue la persona que "llenó" la información que se requiere en el sobre en el cual se deposita la evidencia a pesar de que así se supone que se haga (E.N.P., pág. 26);

(h) no sabe de quién era la letra que aparecía en dicho sobre (E.N.P., pág. 22);

(i) colocó dicho sobre en un *locker*, pero no sabe si fue en su *locker* o en el de otro compañero, ya que no recordaba si para esa fecha le habían asignado *locker* (E.N.P., págs. 23–24);

(j) no recordaba si en el *locker* donde colocó el sobre había otra evidencia (E.N.P., pág. 24);

(k) no sabe por cuánto tiempo permaneció la evidencia en dicho *locker*, que pudo ser por un día o muchos días (E.N.P., pág. 24);

(*l*) no recordaba si sobre este caso rindió o no un informe a la División de Drogas (E.N.P., pág. 20);

(m) llevó el sobre con la evidencia al Laboratorio de la Policía pero no recuerda a qué persona se lo entregó (E.N.P., pág. 20), y

(n) recuerda que se lo dio a un químico pero no recuerda su nombre (E.N.P., pág. 20).

Estamos plenamente conscientes de la ola de criminalidad que actualmente azota a nuestro Puerto Rico y de que la misma constituye una de las preocupaciones mayores de nuestra ciudadanía. Reconocemos que una de las causas principales de esa ola de criminalidad lo es el negocio ilícito de narcóticos; el uso de los cuales está destruyendo, literalmente, a nuestra ciudadanía, especialmente a nuestra juventud.

Ello, no obstante, no estamos en disposición de confirmar sentencias condenatorias que privan a una persona de su libertad, logradas las mismas a base de testimonios como el prestado por el agente Laboy Escobar, el cual es uno incompleto, evasivo e irresponsable. *De así hacerlo, estaríamos aprobando dicha conducta.* El Estado tiene el deber de proteger a la ciudadanía de la mencionada ola de criminalidad. Ese deber no puede ser descargado, sin embargo,

en forma negligente. El Estado tiene la obligación de reclutar personal idóneo para la lucha contra el crimen y de brindarle al mismo el entrenamiento necesario para que ese personal pueda llevar a cabo esa difícil y ardua labor.

Entendemos que en el presente caso el Estado no cumplió con su obligación de demostrar que el "contenido" de la evidencia que alegadamente le fuera ocupada al apelante —el cual, por su naturaleza fungible, no podía ser objeto de marca de identificación directa, razón por la cual el mismo pudo haber sido alterado o cambiado— fue objeto de una "adecuada custodia y cuidado" durante el período de tiempo comprendido entre el momento en que dicha evidencia fue ocupada y el momento en que se llevó a cabo dicho análisis químico. No se sabe, repetimos, en qué *locker* fue guardada la evidencia, qué personas tuvieron acceso a la misma y, conforme la declaración del agente Laboy Escobar, en relación con esta evidencia no se siguió el procedimiento usual en estos casos.[20] *En resumen, la prueba de cargo en el presente caso contiene una "laguna o anormalidad" en cuanto al paradero y control de la evidencia en controversia por un período de veinticuatro (24) horas que hace que dicha prueba sea fatalmente defectuosa.* Siendo ello así, resulta evidente que el Estado no aportó aquella prueba en cuanto a la cadena de custodia que produce "convicción moral en un ánimo no prevenido" respecto a si el *contenido* de las envolturas que le fueran ocupadas al apelante fue el mismo que en su día examinara el químico Martínez Rosa. Dicha situación acarrea la *inadmisibilidad en evidencia* del resultado del análisis químico realizado por Martínez Rosa,

---

[20] Según señaláramos en la pág. 5 surge de la declaración del agente Laboy Escobar que no se siguió el procedimiento normal en estos casos pues la persona que guardó la evidencia en el sobre no fue la misma que llenó la información en el mismo. Desconocemos qué persona fue la que suplió dicha información y tuvo por tanto acceso a la evidencia.

*Pueblo v. Bianchi Álvarez*, ante, por cuanto la prueba, en relación con la cadena de evidencia, resulta ser insuficiente en derecho.

Este Tribunal no puede permitir que en esta jurisdicción se prive de su libertad a uno de nuestros conciudadanos a base de testimonios vacilantes, evasivos e incompletos vertidos por agentes del orden público, los cuales se supone estén entrenados no sólo para lidiar con la comisión de los delitos públicos en sí sino para testificar con veracidad y responsabilidad ante nuestros tribunales de justicia. *Se dictará sentencia revocatoria de la emitida por el tribunal de instancia.*

El Juez Asociado Señor Negrón García emitió opinión disidente, a la cual se une el Juez Asociado Señor Alonso Alonso.

—O—

Opinión disidente del Juez Asociado Señor Negrón García, a la cual se une el Juez Asociado Señor Alonso Alonso.

I

Disentimos. Los hechos no contradichos que dieron margen a la acusación y convicción del apelante Heriberto Carrasquillo Morales, c/p Roberto Rivera Nieves, aparecen consignados en la opinión del Tribunal.

Su análisis *integral* refleja, en esencia, que el 7 de marzo de 1985, aproximadamente a las 4:00 P.M., los agentes José R. Velázquez Sánchez y Emérito Laboy Escobar intervinieron válidamente y arrestaron a Carrasquillo Morales cuando realizaba una transacción de sustancias controladas. E.N.P., págs. 3–5. Ocuparon $115 en billetes de varias denominaciones *y una bolsa plástica transparente que contenía quince (15) envolturas de papel celofán encerados —a ma-*

*nera de "decks"— clipeados, los cuales tenían unos diseños en colores y polvo blanco en su interior.* E.N.P., pág. 5.

Luego de Velázquez Laboy poner sus iniciales en la bolsa plástica transparente y en todas las envolturas, a las 4:40 P.M. las entregó a su compañero Laboy Escobar en la Oficina de la División de Drogas y Narcóticos. E.N.P., págs. 6 y 17. A las 4:45 P.M., Laboy Escobar —debidamente cualificado para realizar *prueba de campo* y detectar sustancias controladas— en presencia de Velázquez Sánchez hizo dicha prueba en una de las quince (15) envolturas y obtuvo como resultado positivo heroína. E.N.P., págs. 6–7 y 20–21. De su puño y letra, en el original del documento, describió así su contenido:

> Una bolsa plástica transparente con un cierre de presión con una línea azul (y una amarilla en su parte superior que contiene 15 envolturas de papel celofán cogidas con un tape transparente las cuales contienen un polvo color blanco en su interior. Once (11) envolturas de éstas con el emblema de una carita alegre y otras 2 de éstas con el emblema de un camello y un león, otra con el emblema de un león y la otra con un emblema de un mono. *Exhibit* I del Pueblo, 7 de marzo de 1985.

Inmediatamente después, puso todo ese material —incluso tres (3) copias del documento sobre la prueba de campo realizada— en el *Sobre de Evidencia Núm. 25966.* Lo cerró y escribió el nombre del acusado, el lugar de los hechos y el suyo en calidad de agente que realizó la *prueba de campo.* E.N.P., pág. 22. También Velázquez Sánchez firmó dicho sobre. E.N.P., pág. 7. Así sellado, el agente Laboy Escobar lo colocó en *un "locker"* —no recordó si el de Velázquez Sánchez o el suyo propio— existente en la Oficina de la División de Drogas y Narcóticos, donde permaneció. E.N.P., págs. 22 y 24. Al *otro día*, a las 2:30 P.M., llevó y sometió al Laboratorio Criminal de la Policía el *Sobre de Evidencia Núm. 25966.* *Exhibit* IV del Pueblo. El material fue sometido ese mismo día a análisis. Dispone:

Una (1) bolsa plástica transparente, con cierre de presión, que contiene quince (15) bolsas de celofán, cogidas con cinta adhesiva transparente; once (11) de estas con el dibujo de una carita de color azul, dos (2) con el dibujo de un león de color anaranjado, una (1) con el dibujo de un mono color rojo y la última con el dibujo de un león de color anaranjado y un camello de color violeta, todas ellas conteniendo polvo blanco. Sobre: 25966.

*RESULTADO DEL ANALISIS*: Mediante análisis químico practicado al polvo blanco de cada una de las bolsas de celofán, se determinó la presencia de HEROINA. Peso total del polvo: .2425 gramos.

Caso: *Roberto Rivera Nieves.*

Lo expuesto nos mueve a coincidir con la conclusión del Tribunal de que inequívocamente *"el sobre y las quince (15) envolturas* que el agente Velázquez Sánchez ocupara en la persona del apelante, el día 7 de marzo de 1985, es el *mismo sobre* y las *quince (15) envolturas* que fueron presentadas en evidencia durante el proceso que fuera celebrado a nivel de instancia. Ello es así por cuanto el agente Velázquez Sánchez, luego de ocupar dicha evidencia, *inició* tanto el sobre como cada una de las quince (15) envolturas, y éste, en el proceso celebrado, reconoció sus iniciales en dicha evidencia, despejando así cualquier duda sobre ese hecho". (Énfasis en el original.) Opinión del Tribunal, pág. 703.

## II

En estas circunstancias no cabe sostener que el testimonio defectuoso del agente Laboy Escobar genere dudas en torno a si dicha evidencia fue cambiada, alterada o contaminada. Aunque su testimonio nos permita concluir que en el tribunal observó una conducta laxa, susceptible de crítica judicial, ello no altera la realidad de que el Ministerio Fiscal probó indubitadamente que la sustancia ocupada era la misma. Rehusamos evaluarlo aisladamente y sin tomar en consideración el resto de la prueba testifical y documental no

contradicha. Admitidamente dicho agente declaró no recordar varias fechas y extremos importantes. E.N.P., págs. 19–24, 26 y 29. Sin embargo, explicó que ello se debió a que no había revisado su declaración jurada, a que no tenía ante sí copia del análisis y al transcurso de tanto tiempo. E.N.P., págs. 19–20. Esa aseveración explica satisfactoriamente sus lagunas. Al juzgar su credibilidad —al igual que al Jurado— ayuda a comprender su falta de memoria. Como cuestión de realidad, al mostrársele los documentos sobre la *prueba de campo* y el *Sobre de Evidencia Núm. 25966*, los reconoció inmediatamente. E.N.P., págs. 20 y 22. Su testimonio demostró que era el mismo sobre que llevó al laboratorio (E.N.P., pág. 22) y que parte de la información apuntada en su exterior —que describe la evidencia ocupada— pudo ser llenada por un compañero. E.N.P., pág. 25. Ello coincide plenamente con la declaración de Velázquez Sanchez de que ambos lo sellaron y firmaron. E.N.P., pág. 7. También, de que estuvo así guardado hasta llevarlo al laboratorio. Además indicó que si el sobre sellado era abierto dejaba alguna marca. E.N.P., págs. 24 y 26.

El residuo probatorio del testimonio de Laboy Escobar, conjuntamente con la propia evidencia documental que identificó, es suficiente para suplir las lagunas en su recuerdo. Sin dificultad, identificó la *prueba de campo* que con su puño y letra consignó. Con vista a ese documento atestó que esa prueba reveló que el polvo en una de las envolturas era heroína. Ello, unido al examen integral del testimonio del agente Velázquez Sánchez, despeja cualesquiera reservas en cuanto a la custodia y autenticidad de la sustancia ocupada.

Abonan a esta conclusión las características físicas del sobre plástico y las quince (15) envolturas de celofán, cogidas con cinta adhesiva y con dibujos peculiares. Si bien la heroína es de naturaleza fungible, descartamos la posibilidad de que así resguardadas y empaquetadas pudieran contaminarse, aun cuando fueran provisionalmente depositadas en

un *locker* con otros sobres de evidencia. Repetimos, la bolsa plástica y sus envolturas quedaron físicamente separadas dentro del *Sobre de Evidencia Núm. 25966* en dicho *locker*. No hay la más mínima evidencia de que fuera abierto mientras estuvo allí.[1] Antes de que transcurrieran escasamente veinticuatro (24) horas, el agente Laboy Escobar lo llevó y entregó al laboratorio. El informe del químico Rafael Martínez Rosa acredita fehacientemente el recibo de ese material y concuerda en cuanto a sus características exteriores generales y peculiares, y con la calidad de la sustancia. Cualesquiera dudas al efecto quedan disipadas del propio análisis. Éste confirmó —en cuanto a *todas* las envolturas (*decks*)— *la existencia de la sustancia heroína, tal y como inicialmente había revelado la prueba de campo en cuanto a una de las envolturas.*

Como dijimos en *Pueblo v. Bianchi Álvarez*, 117 D.P.R. 484, 492 (1986):

> *El proponente de la evidencia no viene obligado a excluir toda imaginable oportunidad de alterar la identidad o carácter de la prueba.* Convencida la sala de instancia que no ha habido anormalidad que afecte la adecuada custodia de la evidencia, es al jurado a quien compete considerarla y evaluarla a la luz de las circunstancias que la rodean. *United States* v. *Lane*, 591 F.2d 961 (D.C. Cir. 1979). Una vez que el proponente de la evidencia cumple el requisito previo de demostrar que "con razonable probabilidad el objeto no ha sufrido cambio en ningún aspecto importante de su estado original", *United States* v. *Albert*, supra, pág. 290; *United States* v. *Alston*, 460 F.2d 48 (5to Cir. 1972), *cert.* denegado, 409 U.S. 871 (1972), cualquier duda que surja respecto a la posible adulte-

---

[1] En ausencia de prueba indicativa de que el material depositado fue alterado o contaminado, se ha rechazado la contención de que es inadmisible por el hecho de que varias personas puedan haber tenido acceso a la caja de seguridad usada para guardarlos. *United States v. Santiago*, 534 F.2d 768, 769 (7mo Cir. 1976); *United States v. Bailey*, 277 F.2d 560, 565 (7mo Cir. 1960); *United States v. Fletcher*, 487 F.2d 22, 23 (5to Cir. 1973).

ración o contaminación de la evidencia *se dirige al peso y no a la admisibilidad de la prueba. Ballou* v. *Henri Studios, Inc.*, supra, págs. 1154–1155. (Énfasis suplido.)

. En resumen, las lagunas y fallas de memoria en el testimonio del agente Laboy Escobar, producto del tiempo transcurrido, fueron superadas y esclarecidas por el testimonio del agente Velázquez Sánchez. Los eslabones de la cadena evidenciaria fueron probados. Sobre todo, la propia prueba documental concluyentemente demostró que el sobre plástico y las quince (15) envolturas ocupadas al apelante Carrasquillo Morales —que contenían heroína— no sufrieron cambios sustanciales ni fueron alteradas ni contaminadas. *Pueblo v. Bianchi Álvarez*, supra. Con razonable certeza el Estado probó que las medidas cautelares que adoptó para preservar su condición original fueron suficientes.[2] En estas circunstancias, en buena juridicidad, rehusamos intervenir con la decisión del foro de instancia admitiéndola.

Confirmaríamos la sentencia apelada.

---

[2] El mero hecho de que falte un eslabón no impide la admisibilidad, siempre y cuando exista prueba suficiente de que la evidencia es lo que pretende ser y no ha sido alterada en su aspecto material. *United States v. Jackson*, 649 F.2d 967, *cert.* denegado, 454 U.S. 801, 1034 (1981); *United States v. Mullins*, 638 F.2d 1151 (8vo Cir. 1981); *United States v. Howard-Arias*, 679 F.2d 363, 366, *cert.* denegado, 459 U.S. 874 (1982).