EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| El Pueblo de Puerto Rico<br><br>Peticionario<br><br>v.<br><br>Héctor Henríquez Rivera<br><br>Recurrido<br><br>———————————<br><br>El Pueblo de Puerto Rico<br><br>Peticionario<br><br>v.<br><br>Yicauri Urbáez Mateo<br><br>Recurrido | Certiorari<br><br><br>2020 TSPR 114<br><br>205 DPR \_\_\_\_\_ |

Número del Caso:  CC-2019-645


Fecha:  28 de septiembre de 2020


Tribunal de Apelaciones:

    Panel X


Oficina del Procurador General:

    Lcdo. Isaías Sánchez Báez
    Procurador General

    Lcda. Mónica Durán Ortiz
    Procuradora General Auxiliar


Abogados de los recurridos:

    Lcda. Maríana Miranda Juarbe
    Sociedad Para Asistencial Legal

    Lcdo. Héctor Henríquez Rivera


Materia:  Sentencia con Opinión de Conformidad y Opinión de Conformidad en parte y Disidente en parte.


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| El Pueblo de Puerto Rico<br><br>  Peticionario<br><br>        v.<br><br>Héctor Henríquez Rivera<br><br>  Recurrido<br><br>El Pueblo de Puerto Rico<br><br>  Peticionario<br><br>        v.<br><br>Yicauri Urbáez Mateo<br><br>  Recurrido | CC-2019-0645    *Certiorari* |

SENTENCIA

En San Juan, Puerto Rico a 28 de septiembre de 2020.

En el presente caso nos corresponde determinar si el Tribunal de Apelaciones erró al concluir que procedía revocar ciertas *Sentencias* condenatorias de los aquí recurridos. Ello, por entender que no se probó la culpabilidad de éstos más allá de duda razonable, estimar que se presentó testimonio estereotipado que no merecía crédito y concluir que había errado el foro primario al admitir cierta evidencia.

Tras un análisis de la prueba desfilada y los hechos ante nuestra consideración, así como del derecho aplicable,

somos del criterio que el foro apelativo intermedio -- en parte --erró en su determinación, por lo que procedemos a modificar el dictamen recurrido. Veamos.

## I.

A consecuencia de los hechos que se esbozan a continuación, se acusó al señor Héctor Henríquez Rivera (en adelante, "señor Henríquez Rivera") por infracción a los Arts. 5.04 (Portación y uso de armas de fuego sin licencia) y 6.01 (Fabricación, distribución, posesión y uso de municiones) de la Ley de Armas de Puerto Rico, Ley Núm.404-2000, 25 LPRA sec.458c y 459; Arts. 192 (Recibo, disposición y transportación de bienes objetos del delito), 245 (Empleo de violencia o intimidación contra la autoridad pública) y 246 (Resistencia u obstrucción a la autoridad pública) del Código Penal de Puerto Rico de 2012, 33 LPRA 5262, 5335 y 5336; y Art. 7.02 (Manejo de vehículos de motor bajo los efectos de bebidas embriagantes) de la Ley de Vehículos y Tránsito de Puerto Rico, Ley Núm.22-2000, 9 LPRA sec.5202. Por su parte, el señor Yicauri Urbáez Mateo (en adelante, "señor Urbáez Mateo") fue acusado por infracción al Art. 5.04 de la Ley de Armas de Puerto Rico, *supra*, y el Art. 401 de la Ley de Sustancias Controladas de Puerto Rico, Ley Núm. 4 del 23 de junio de 1971, 24 LPRA sec. 2401, en su vertiente de intención de distribuir.

La celebración del juicio en su fondo se llevó a cabo los días 2 y 23 de diciembre de 2013, el 24 de septiembre de

2015, el 14 de diciembre de 2015 y el 9 de abril de 2016. Durante dicho procedimiento judicial se narraron los siguientes hechos por medio de la prueba testifical.[1]

El Agente César Arocho Torres[2] (en adelante, "Agente Arocho Torres") testificó que el 19 de enero de 2013 -- a eso de las 7:00 p.m. -- se reportó al Cuartel de Añasco, luego de que el supervisor de su Unidad Motorizada le informara que ayudaría a proveer refuerzos, en ocasión de las fiestas patronales de Añasco. Se le instruyó dar rondas preventivas, junto a los Agentes Javier O. Rivera Vélez y Herminio Sánchez Ramos (en adelante, "Agente Rivera Vélez" y "Agente Sánchez Ramos"). Señaló que, a eso de las 11:00 p.m., mientras tomaba un descanso junto a los Agentes Rivera Vélez y Sánchez Ramos, observó un Toyota color champagne con cristales unidireccionales y sumamente oscuros. Por entender que los mismos podrían estar en violación de la Ley de Vehículos y Tránsito de Puerto Rico, *supra*, informó sobre los mismos a sus compañeros, para así intervenir con el vehículo de motor. Véase, Transcripción de la prueba oral (en adelante, "TPO"), págs. 60-61. Acto seguido, continuaron tras el vehículo, deteniéndolo después de dejarlo transitar cierta distancia. Esto, debido al volumen de tránsito y los numerosos vehículos estacionados al margen de la carretera. Eventualmente, al llegar a la calle principal del

---

[1] La prueba testifical solamente incluyó los testimonios de los Agentes César Arocho Torres, Javier O. Rivera Vélez y Herminio Sánchez Ramos.
[2] El Agente César Arocho Torres, al momento del juicio, era parte de la unidad motorizada de Mayagüez y llevaba diecinueve (19) años laborando como policía.

Residencial Francisco Figueroa, utilizaron biombos y sirenas para ordenar al conductor del vehículo detenerse.

Luego de desmontar de su motocicleta, se fue acercando al vehículo. Al aproximarse, y debido a que los cristales del carro estaban a medias, pudo observar que había tres (3) personas en el vehículo: un conductor, un pasajero delantero y un pasajero trasero en el lado del conductor. Al notar esto, hizo señales al agente Rivera Vélez -- quién estaba a unos pasos de él -- para informarle que en el referido automóvil había tres (3) ocupantes. De la misma forma, notó que el pasajero trasero, quien resultó ser el señor Urbáez Mateo, tenía una lata de cerveza Medalla en mano.

Así las cosas, solicitó al conductor del vehículo -- identificado en sala por el Agente Arocho Torres como el señor Henríquez Rivera -- los documentos requeridos por ley. En ese momento, pudo observar que el conductor tenía una lata de cerveza en la mano. Al solicitarle los documentos pertinentes, éste colocó la cerveza entre sus piernas y le entregó al agente una licencia de aprendizaje y la registración del carro. Vista la licencia, el agente testificó que se dio cuenta que la misma estaba vencida.

Indicó que comenzó a entablar una conversación con el señor Henríquez Rivera, la cual se tornó un poco hostil. TPO, pág.64. Señaló que, de forma coetánea, comenzaron a aglomerarse personas alrededor de la intervención, quienes también se empezaron a comportar de forma hostil. *Íd.* Con esto en mente, el agente le informó al señor Henríquez

Rivera que su licencia era de aprendizaje y que la misma estaba vencida. Ante esto, el señor Henríquez Rivera le expresó que tenía una licencia de conducir vigente y la comienza a buscar. Durante dicho proceso de búsqueda, según testificó el agente Arocho Torres, se percató que el señor Henríquez Rivera estaba expidiendo olor a licor y parecía estar bajo los efectos de bebidas embriagantes. Además, estaba "hablando incoherente". TPO, pág.65. Indicó que le comunicó al señor Henríquez Rivera que apagara el auto y que tuvo que insistir para que éste lo hiciera.

Ante las preguntas del Fiscal, el agente Arocho Torres señaló que concluyó que el señor Henríquez Rivera estaba bajo los efectos de bebidas embriagantes por la forma en que habló, al tener los ojos rojizos, por el olor a licor que expedía y la lata de cerveza en su posesión. TPO, pág.65. Acto seguido, el agente Arocho Torres le solicitó al señor Henríquez Rivera que se bajara del carro, con la intención de leerle las advertencias de ley y ponerlo bajo arresto por conducir un vehículo bajo los efectos de bebidas embriagantes.

Expresó que una vez le insistió que apagara el vehículo, ayudó al señor Henríquez Rivera a abrir la puerta del carro para que éste pudiese desmontarse. Simultáneamente, el pasajero frontal del lado derecho abrió la puerta y emprendió carrera hacia dentro de los edificios del Residencial Francisco Figueroa. El agente Arocho Torres señaló que, transcurrido los hechos de referencia, el señor

Henríquez Rivera lo trató de sacar de balance y comenzó a forcejear con él. TPO, pág.66. Especificó que el señor Henríquez Rivera lo empujó con ambas manos, sujetando la lata de cerveza en una de ellas, la cual, en el proceso del empujón, se le cayó al piso. Igualmente, describió el forcejeo como tratar "de agarrarlo entre la cintura y la mano derecha de él para intenciones de llevarlo al, al piso para así poderlo arrestar, pero en ese forcejeo cae". TPO, pág.67.

Mencionó que, durante dicho forcejeo, cayó al piso un arma de fuego de la cintura del señor Henríquez Rivera. Al percatarse, el agente Arocho Torres gritó "¡Pistola!", con la intención de que los otros agentes lo escucharan. Consecutivamente, soltó al señor Henríquez Rivera y agarró el arma de fuego. El arma fue identificada durante su testimonio como una HK Compact, calibre 40, color negro, con número de serie 26-079719, con un cargador con varias balas.[3] TPO, págs.68-69.

Señaló que, una vez aseguró el arma, el señor Henríquez Rivera huyó hacia dentro de los edificios del Residencial Francisco Figueroa. Narró que, luego de que éste dio carrera, ocupó el vehículo abandonado y lo transportó a la unidad motorizada, donde se realizó un registro de inventario. Durante dicha búsqueda, se encontró un magacín negro, marca Taurus, con nueve (9) balas. TPO, pág.68.

---

[3] Posteriormente, señaló que, al verificar la procedencia del arma en el sistema, pudo comprobar que ésta había sido hurtada en Caguas.

Asimismo, señaló que encontró la licencia vigente del señor Henríquez Rivera.

En cuanto a los tintes del carro, añadió que utilizó un fotómetro en el lugar de los hechos, pero que posteriormente, durante el registro de inventario, realizó la prueba a todos los cristales. Dicha examinación resultó en que un cristal arrojara 2%, otro 3% y los restantes un 4%. Por todo lo anterior, expidió un boleto por los tintes y dos por los envases abiertos de bebidas embriagantes.

Ahora bien, ante preguntas sobre el arma y cargadores, el agente Arocho Torres expresó que la evidencia mostrada durante el juicio era la misma que él había ocupado durante su intervención con el señor Henríquez Rivera. Indicó que reconocía el arma por el número de serie y los datos que había anotado, aunque aceptó que no había identificado o particularizado la evidencia de otra forma.[4] TPO, págs.69-72. Igualmente, identificó el cargador del arma. En cuanto al cargador Taurus, ocupado durante el registro de inventario, expresó que lo reconocía porque anotó la información de la marca y numeración. TPO, págs.75-77. Empero, el Agente Arocho Torres aceptó que no había particularizado la evidencia antes citada. TPO, págs. 78, 88.

---

[4] El arma aparentaba tener algún tipo de tarjeta o documento adjunto al embalado de plástico hecho por el Agente Arocho Torres. Dicha tarjeta o documento no había sido preparado por él, pero tenía su firma. Las iniciales del Agente Arocho Torres acreditaban la entrega del arma en el Instituto de Ciencias Forenses. TPO, pág.73. Por lo tanto, el foro primario la admitió como "Exhibit 1" del Ministerio Público, sujeto a que testificara la persona que había preparado dicha tarjeta o documento. De la transcripción de la prueba oral no se desprende a qué tarjeta o documento se refieren. En ese momento, el Fiscal señaló que el testigo forense testificaría en cuanto al arma. TPO, pág.74. Sin embargo, dicho testimonio no se presentó.

Por otro lado, detalló que había transportado la evidencia en una caja de Fiscalía, la cual estaba sellada e iniciada con su nombre y número de placa. TPO, pág.79. La caja también tenía adherido un documento de recibo, firmado por el agente Arocho Torres y otros funcionarios. *Íd.*, págs.79-83. En cuanto a la cadena de custodia, señaló que llevó dicha evidencia a Ciencias Forenses para análisis, además de la Fiscalía, lo cual constaba acreditado en el documento de cadena de custodia del arma.

Por su parte, el Agente Rivera Vélez reiteró lo previamente expresado por el Agente Arocho en cuanto a la razón de su presencia en el área y cómo detuvieron el vehículo. Señaló que, luego de que el automóvil fue detenido, él se posicionó en la parte trasera izquierda del carro, debido a que el carro tenía tres (3) pasajeros y los tintes eran oscuros. A través del cristal posterior del carro, el cual estaba a mitad, pudo observar un joven de tez trigueña, que vestía un abrigo rojo y portaba una cerveza abierta en su mano derecha, la cual descansaba sobre la pierna derecha. Este joven fue identificado en sala como el señor Urbáez Mateo.

El Agente Rivera Vélez indicó que observó al Agente Arocho Torres intervenir con el conductor del vehículo y que éste le solicitó al conductor los documentos pertinentes. Asimismo, expresó que, en ese momento, estaban presentes -- alrededor del área -- personas con actitud hostil, las

cuales estaban utilizando palabras soeces y reclamándoles por la intervención.

Mencionó que, seguidamente, el pasajero delantero desmontó y dio carrera, mientras que el conductor empujó por el pecho al Agente Arocho Torres -- cayéndose así una lata de cerveza -- y comenzó un forcejeo entre éstos. Debido a lo que mencionáramos, el Agente Rivera Vélez le instruyó al señor Urbáez Mateo que mantuviera sus manos visibles. Dicho Agente señaló que, además del forcejeo, ya había visto el pasajero delantero emprender marcha, lo cual le pareció sospechoso. Indicó que, posteriormente, continuó el forcejeo y cayó un arma de color negro al piso. Ante esto, el Agente Arocho Torres gritó "¡Pistola!" y el señor Henríquez Rivera empezó a correr hacia el Residencial Francisco Figueroa.

Confrontado con estos hechos, el Agente Rivera Vélez le ordenó al señor Urbáez Mateo que se desmontara del vehículo. Al éste bajarse del carro, el Agente Rivera Vélez lo agarró por el brazo izquierdo, informándole que estaba bajo arresto. Esto, ya que había visto la evidencia delictiva con relación al arma de fuego. TPO, págs. 233-234. Señaló que el señor Urbáez Mateo empleó resistencia activa y tensó el brazo, haciendo movimientos como si fuese a emprender huida. Finalmente, con la ayuda del Agente Sánchez Ramos, logró ponerle los grilletes. Luego, el Agente Rivera Vélez registró al mismo, por seguridad. Al palpar por encima del abrigo y por el interior de su mahón, el Agente Rivera Vélez pudo identificar un objeto sólido. Al verificar, pudo

constatar que era un arma de fuego, color níquel y negro, la cual estaba cargada. Informó y gritó que tenía un arma de fuego y continuó el registro. TPO, pág. 235. Así, ocupó del bolsillo derecho del abrigo una bolsa plástica trasparente de cierre a presión, con muchas bolsitas plásticas transparentes y color rojo, con cierre a presión, con supuesta picadura de marihuana en su interior. *Íd*.

Una vez le leyó las advertencias al señor Urbáez Mateo y lo transportó al Cuartel de Distrito de Añasco, el Agente Rivera Vélez le tomó fotos con su celular a la evidencia ocupada. Es decir, entre otras, la pistola *Smith & Wesson*, nueve (9) milímetros, color níquel y negra, número de serie A391176, con un cargador con siete (7) balas, así como doce (12) bolsitas plásticas transparentes con supuesta picadura de marihuana en su interior. TPO, pág.237. Además, preparó el formulario PPR126, en el cual se detalla la evidencia ocupada y el cual fue firmado por el señor Urbáez Mateo. El arma, cargador y balas no fueron identificadas con algún "label" por el Agente Rivera Vélez. TPO, págs. 287-288.

Luego, éste se dirigió a la División de Drogas de Mayagüez, donde se practicó la prueba de campo.[5]

---

[5] El Tribunal de Primera Instancia permitió a la defensa que dialogara brevemente con los testigos del Instituto de Ciencias Forenses -- los cuales habían comparecido para testificar sobre los informes de cadena de custodia y el funcionamiento de las armas -- para poder identificar si se podían despachar. Como consecuencia de dicha interacción, parte de la evidencia fue estipulada. TPO, pág.279. Esto incluyó el testimonio de Yarelis Falcón y los certificados de funcionamiento de armas firmados por ésta. Igualmente se estipuló la "solicitud de análisis cadena de custodia" con relación al arma ocupada por el Agente Rivera Vélez, aunque con disputa en cuanto a la versión del documento que fue admitido, por éste estar solamente completado parcialmente. TPO, págs.290-293. Durante esta discusión, el licenciado Roland Arroyo Rojas, abogado del señor

Eventualmente, el Agente Rivera Vélez también transportó el arma, cargador y balas al Instituto de Ciencias Forenses. Durante el juicio, y ante preguntas del Fiscal, el Agente Rivera Vélez identificó el arma por su número de serie, mediante las fotos que había tomado el día de los hechos. Aseguró que el arma presentada en el juicio fue la misma que ocupó. TPO, págs. 237-238,245. De la misma forma, así identificó la demás evidencia, es decir, cargador y balas. *Íd.*, pág.244. Sin embargo, en cuanto al cargador y balas, el Agente Rivera Vélez aceptó que no tenían un número de serie. *Íd.*, págs.287-288.

Por su parte, el Agente Sánchez Ramos testificó brevemente.[6] Al igual que los otros dos agentes, indicó que estaba patrullando preventivamente en ocasión de las fiestas patronales. Expresó que estaban intervenido con el vehículo donde se encontraban los recurridos -- por violación a la Ley Núm.22-2000 -- cuando se abrieron, casi simultáneamente,

---

Henríquez Rivera, objetó la admisión del informe de cadena de custodia en cuanto al arma ocupada a su cliente, ya que habían comparecido todos los funcionarios del Instituto de Ciencias Forenses menos una. En ese sentido, dijo que estaba dispuesto a estipular o estaría de acuerdo con parte de la cadena de custodia, con excepción de la funcionaria que no compareció. TPO, pág. 283. Tras escuchar los argumentos de ambas partes, el foro primario admitió el mismo.

Previamente en el juicio, se había estipulado -- sobre el análisis de la droga -- la solicitud de prueba de campo, solicitud de análisis y certificado de análisis químico forense del Instituto de Ciencias Forenses. Tanto en la prueba de campo, como en la solicitud de análisis, la sustancia confiscada dio positivo a la sustancia de marihuana. Por lo anterior, los funcionarios del Instituto de Ciencias Forenses que trabajaron con la sustancia controlada fueron excusados.

[6] El Agente Sánchez Ramos no prestó declaración jurada en el caso de epígrafe ni había testificado en ningún proceso anterior al juicio. Por otro lado, durante el juicio, el Ministerio Público puso al Agente Sánchez Ramos a la disposición de los abogados de defensa, ya que entendían que su testimonio era prueba acumulativa.

las puertas del conductor y el pasajero delantero. El conductor, quien el Agente Sánchez Ramos identificó en sala como el señor Henríquez Rivera, se bajó del carro, mientras que el pasajero delantero comenzó a correr hacia los edificios del residencial. Como consecuencia, el Agente Sánchez Ramos gritó que alguien estaba corriendo y se colocó en una posición de seguridad. TPO, pág.306. Adicionalmente, expresó que escuchó cuando el Agente Arocho Torres indicó que había un arma. Por último, añadió que ayudó al Agente Rivera Vélez -- y no así al Agente Arocho Torres -- durante su arresto, ya que el señor Urbáez Mateo se había tornado hostil y había personas agrupadas alrededor de la intervención, también con actitud hostil. TPO, pág.308.

Así pues, tras evaluar la prueba testifical y documental antes mencionada, el Tribunal de Primera Instancia dictó *Sentencias* hallando culpable a los señores Henríquez Rivera y Urbáez Mateo de todos los delitos imputados, con excepción del cargo por violación al Art. 192 del Código Penal de 2012, *supra*, en contra del señor Henríquez Rivera.

Inconformes, los señores Henríquez Rivera y Urbáez Mateo presentaron sendas apelaciones criminales, solicitando la revisión de las sentencias dictadas en su contra.[7] Por un lado, el señor Henríquez Rivera arguyó que el foro primario erró al admitir en evidencia el arma y las municiones ocupadas, a pesar de que las mismas no habían sido

---

[7] Dichos recursos fueron consolidados por el Tribunal de Apelaciones.

identificadas y autenticadas adecuadamente, además de no haberse cumplido con la cadena de custodia; al admitir en evidencia la caja donde se preservaron el arma y municiones, a pesar de que ésta no fue descubierta con anterioridad al juicio; y al no absolver al acusado, encontrándolo culpable en base de testimonios estereotipados y sin que se probaran los elementos de los delitos más allá de duda razonable.

Por su parte, el señor Urbáez Mateo señaló que el Tribunal de Primera Instancia había errado al no considerar su solicitud de supresión de evidencia, tras surgir testimonio nuevo y contradictorio de los agentes; al hallar culpable más allá de duda razonable al señor Urbáez Mateo con el testimonio estereotipado de los agentes;[8] y al hallar culpable al señor Urbáez Mateo del cargo por Art. 401 de la Ley de Sustancias Controladas, *supra*, sin tener evidencia del elemento de intención de distribuir.

Evaluados los planteamientos de las partes, el 21 de junio de 2019 el Tribunal de Apelaciones notificó una *Sentencia*, revocando los dictámenes recurridos. Primero, el foro apelativo intermedio planteó que el testimonio de los agentes era estereotipado y no gozaba de confiabilidad. Así, señaló que el testimonio del Agente Arocho Torres contenía contradicciones e inconsistencias. Indicó, por ejemplo, que el Agente Arocho Torres había ofrecido distintas versiones

---

[8] Arguyó que los testimonios de los agentes, los cuales establecían los motivos fundados para la intervención, no merecían crédito. Además, indicó que, al ser ilegal su arresto, también lo era el registro efectuado.

sobre si llevó a cabo la prueba de tintes en la escena o una vez se hizo el registro de inventario del vehículo. De la misma forma, indicó que algunos de los detalles ofrecidos por los agentes, y particularmente por el Agente Arocho Torres, eran inverosímiles. Al foro a quo le pareció increíble que, por ejemplo, los ocupantes del vehículo tuvieran latas de cervezas abiertas y las mantuvieran en sus manos mientras los agentes intervenían con ellos, o que los Agentes Rivera Vélez y Sánchez Ramos no asistieran al Agente Arocho Torres mientras éste forcejeó con el señor Henríquez Rivera. Igualmente, señaló que les parecía improbable que el señor Henríquez Rivera estuviese incoherente, pero como quiera pudiese forcejear con el Agente Arocho Torres.

El Tribunal de Apelaciones también determinó que, debido a que el testimonio del Agente Arocho Torres no era confiable, y que el arma y municiones incautadas por éste no habían sido identificadas, las mismas no eran admisibles como evidencia.[9] En vista de lo anterior, el Tribunal de Apelaciones concluyó que no se probó más allá de duda razonable la culpabilidad de los señores Henríquez Rivera y Urbáez Mateo.

Asimismo, el foro apelativo intermedio determinó que no se demostró que los agentes tuviesen motivos fundados para intervenir con el señor Henríquez Rivera y Urbáez Mateo sin

---

[9] El Tribunal de Apelaciones también sentenció que la caja donde se había preservado la evidencia no era admisible en evidencia, por no haberse descubierto como prueba dentro del término dispuesto en la Regla 95(B) de Procedimiento Criminal, 34 LPRA Ap. II.

orden judicial previa. Señalaron que, de igual manera, el Ministerio Público no logró rebatir la presunción de ilegalidad de los registros y arrestos sin orden, haciendo toda la evidencia ocupada inadmisible. Inconforme con el proceder del Tribunal de Apelaciones, la Oficina del Procurador General presentó una *Moción de reconsideración*, la cual fue denegada por el foro *a quo*.

Aún insatisfecho, el 14 de agosto de 2019 la Oficina del Procurador General compareció ante nos mediante una *Petición de certiorari*. En ella, señala que el foro apelativo intermedio erró al determinar que eran inadmisibles las dos (2) armas de fuego presentadas como evidencia, toda vez que éstas mostraban íntegramente su número de serie, aun si les faltaban etiquetas de identificación. Además, arguyen que el foro *a quo* erró al descartar la credibilidad que el foro primario le confirió al testimonio de los agentes, sustituyendo injustificadamente la apreciación de la prueba del juzgador. Señalan que, en la alternativa, no procedía la revocación de las condenas, ya que -- aun presumiendo que las armas fueron incorrectamente admitidas -- no es necesaria la ocupación de un arma de fuego para un fallo de culpabilidad por infracción a la Ley de Armas, *supra*. Ello, ante los testimonios de los agentes, los cuales observaron la portación de las armas de fuego.[10] Oportunamente, los

---

[10] Para sustentar dicho argumento, citan a *Pueblo v. Acabá Raíces*, 118 DPR 369 (1987). En el referido caso, esta Curia expresó que, en los casos de posesión y portación de armas, "[c]on pragmatismo judicial -- pues imposibilitaría todo encauzamiento y eficacia probatoria convincional cuando un arma de fuego no es ocupada -- desde principios de siglo

señores Henríquez Rivera y Urbáez Mateo presentaron sus alegatos en oposición.

Con el beneficio de la comparecencia de ambas partes, procedemos a resolver la controversia ante nuestra consideración.

## II.

Como es sabido, el Art. II, Sec. 11 de la Constitución del Estado Libre Asociado de Puerto Rico prescribe que, en todo proceso criminal, el acusado disfrutará de una presunción de inocencia. Art. II, Sec. 11, Const. ELA, LPRA, Tomo 1. De manera que, en dichos procedimientos, se presume que todo acusado es inocente, hasta tanto se pruebe lo contrario más allá de duda razonable. Regla 110 de Procedimiento Criminal, 34 LPRA Ap. II. De lo contrario, procede la absolución del acusado. *Íd*.

De esta forma, "para que pueda obtenerse una convicción válida en derecho que derrote la presunción de inocencia, es un requisito *sine qua non* que el Estado presente prueba respecto a cada uno de los elementos del delito, su conexión con el acusado y la intención o negligencia criminal de este último". *Pueblo v. Acevedo Estrada*, 150 DPR 84, 99 (2000). Véase también *Pueblo v. Bigio Pastrana*, 116 DPR 748, 760-761 (1985). En ese sentido, la prueba tiene que ser suficiente y

---

nuestra doctrina jurisprudencial ha reconocido que no es menester presentarla en evidencia". *Íd*., pág.374. Por lo tanto, "en este tipo de casos un fallo de culpabilidad puede sostenerse si existen otros elementos o circunstancias demostrativas que lleven a la conciencia íntima del juzgador a concluir que el acusado poseía y portaba el arma". *Íd*., pág. 375.

"satisfactoria, es decir, prueba que produzca certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido". *Pueblo v. Acevedo Estrada*, *supra*, pág. 100. Véase, además, *Pueblo v. Cabán Torres*, 117 DPR 645, 652 (1986); *Pueblo v. Carrasquillo Carrasquillo*, 102 DPR 545, 552 (1974).

Esto, sin embargo, no significa que la culpabilidad del acusado debe ser demostrada con certeza matemática o que se debe descartar cada duda plausible. *Pueblo v. Bigio Pastrana*, *supra*, pág. 761. En cambio, la duda razonable que motiva la absolución del acusado es aquella que causa insatisfacción o intranquilidad ante la prueba de cargo, luego de que ésta es evaluada en su totalidad de forma "justa, imparcial y serena". *Pueblo v. García Colón I*, 182 DPR 129, 175-176 (2011); *Pueblo v. Santiago Collazo*, 176 DPR 133, 142-143 (2009).

En esa dirección, en lo que respecta a la causa de epígrafe, y por ser una de las controversias traídas ante nuestra consideración, es menester puntualizar que al señor Urbáez Mateo se le imputó haber infringido el Art. 401 de la Ley de Sustancias Controladas de Puerto Rico, *supra*, en su vertiente de distribución. El precitado artículo dicta que "[e]xcepto en la forma autorizada en este capítulo, será ilegal el que cualquier persona, a sabiendas o intencionalmente [f]abrique, distribuya, dispense, transporte u oculte, o posea con la intención de fabricar, distribuir, dispensar, transportar u ocultar una sustancia

controlada". *Íd*. Por lo tanto, y según la doctrina antes expuesta, para refutar la presunción de inocencia aplicable al señor Urbáez Mateo, el Ministerio Público debía presentar evidencia sobre la posesión de una sustancia controlada por parte del señor Urbáez Mateo y su intención de distribuir la misma.[11] Más adelante, en este escrito, evaluaremos si ello sucedió, o no, así.

## III.

De otra parte, la Regla 901(A) de Evidencia, 32 LPRA Ap. V, establece que "el requisito de autenticación o identificación como una condición previa a la admisibilidad se satisface con la presentación de evidencia suficiente para sostener una determinación de que la materia en cuestión es lo que la persona proponente sostiene". En esencia, se debe demostrar que la evidencia es lo que se dice que es.

Cónsono con lo anterior, el inciso B de la precitada regla expone una lista no exhaustiva de formas de identificar o autenticar evidencia, incluyendo: testimonio por testigo con conocimiento, características distintivas y cadena de custodia. Por consiguiente, la parte que presenta

---

[11] Es pertinente mencionar que el Art. 404 de la Ley de Sustancias Controladas de Puerto Rico, 24 LPRA sec. 2404, al discutir la mera posesión, establece que "[s]erá ilegal el que cualquier persona, a sabiendas o intencionalmente, posea alguna sustancia controlada, a menos que tal sustancia haya sido obtenida directamente o de conformidad con la receta u orden de un profesional actuando dentro del marco de su práctica profesional, o excepto como se autorice en este capítulo".

la evidencia puede elegir, la mayoría de las veces, como proceder. 32 LPRA Ap. V, R.901(B).

Empero, existen instancias en las que, como regla general, se requiere que se pruebe la cadena de custodia de la prueba de cargo, como condición para su admisibilidad. Esto incluye: objetos que contienen evidencia fungible, la cual no puede ser marcada; cuando, a pesar de no ser fungible, la evidencia no tiene "características únicas que la distingan de objetos similares y resulta, igualmente, imposible de marcar o, pudiendo ser marcada, ello no se hizo", y; cuando la condición del objeto es significativa y puede ser fácilmente alterado. *Pueblo v. Echevarría Rodríguez*, 128 DPR 299, 349 (1991); *Pueblo v. Carrasquillo Morales*, 123 DPR 690, 700-701 (1989). Ahora bien, una vez probado que la evidencia no ha sido afectada o ha sufrido alteración, "cualquier duda que surja respecto de la posible adulteración o contaminación de la evidencia, se dirige al peso y no a la admisibilidad de la evidencia". *Pueblo v. Santiago Feliciano*, 139 DPR 361, 425 (1995).

En contraste, bajo ciertas circunstancias, demostrar la cadena de custodia no es indispensable. Por ejemplo, "cuando se ofrecen en evidencia objetos que son fácilmente identificables, ya sea porque poseen unas características distintivas o porque tienen un número o marca particular, no es imprescindible establecer la cadena de custodia para su admisión en evidencia. Así, por ejemplo, cualquier objeto que tenga un número de serie, como un arma o billete, puede

ser identificado por el número". *Pueblo v. Carrasquillo Morales*, *supra*, pág. 699.

IV.

Establecido lo anterior, es menester señalar que el testimonio estereotipado es "aquel que se ciñe a establecer los elementos mínimos necesarios para sostener un delito sin incluir detalles imprescindibles para reforzarlo". *Pueblo v. Camilo Meléndez*, 148 DPR 539, 558 (1999). Véase, *Pueblo v. Rivera Rodríguez*, 123 DPR 467, 480 (1989).

Debido a su naturaleza, el testimonio estereotipado debe ser evaluado con particular cuidado. Lo anterior, con el fin de "frenar el celo excesivo que pueda, vía declaraciones inexactas o falsas, vulnerar los derechos de ciudadanos inocentes". *Pueblo v. González del Valle*, 102 DPR 374, 376 (1974). Véase, *Pueblo v. Camilo Meléndez*, *supra*, pág.558.

Siendo ello así, en *Pueblo v. González del Valle*, *supra*, expusimos seis (6) criterios para utilizar al momento de examinar todo testimonio estereotipado. En primer lugar, dictaminamos que el testimonio estereotipado debe escudriñarse con especial rigor. *Íd.*, pág. 378. Segundo, señalamos que los casos de evidencia abandonada o lanzada al suelo, como aquellos de actos ilegales a plena vista, deben -- en ausencia de otras consideraciones -- inducir sospecha a la posible existencia de testimonio estereotipado. *Íd.* Como tercer factor, enfatizamos que si el testimonio vertido es "inherentemente irreal o improbable debe ser rechazado". *Íd.*

Por otra parte, sentenciamos que "el testimonio estereotipado puede perder su condición de tal si, yendo más allá de los datos indispensables para probar los requisitos mínimos de un delito, se le rodea de las circunstancias en que funciona el agente, el término de su investigación, los resultados obtenidos fuera del caso en trámites y otros detalles". *Íd*. En contraste de lo antes expuesto, cualquier laguna, contradicción o vaguedad en el testimonio debe fortalecer "el recelo con que hay que escuchar esta clase de declaraciones". *Íd*.

Finalmente, indicamos que "el peso de la prueba de librar el testimonio estereotipado de sospecha recae en el fiscal", sin que dicho funcionario pueda recurrir a testimonio flaco y descarnado para cumplir con lo anteriormente esbozado. *Íd*.

Así pues, son los factores precitados los que deben dirigir nuestro análisis al considerar testimonio alegadamente estereotipado.

V.

Finalmente, y por ser en extremo pertinente a la controversia que nos ocupa, conviene recordar que en nuestro ordenamiento jurídico le conferimos un alto grado de deferencia al foro sentenciador, particularmente en lo relacionado a su apreciación de la prueba. Véase, *Pueblo v. Toro Martínez,* 200 DPR 834 (2018). Ello, ya que el foro primario está en posición óptima para examinar la evidencia

testifical presentada, pudiendo observar cercanamente -- y escuchar de primera mano -- a los testigos. *Pueblo v. Toro Martínez*, *supra*, págs. 857-858; *Pueblo v. García Colón I*, 182 DPR 129, 165 (2011); *Pueblo v. Irizarry Irizarry*, 156 DPR 780, 815-816 (2002); *Pueblo v. Cabán Torres*, 117 DPR 645,653-654 (1986).

Siendo ello así, esta Curia ha reiterado que "de ordinario, no intervendremos con el veredicto condenatorio emitido por un jurado o el fallo inculpatorio de un magistrado en 'ausencia de pasión, prejuicio o error manifiesto' en la apreciación que de la prueba realizaron los mismos". *Pueblo v. Cabán Torres*, *supra*, pág.654. En ese sentido, "[l]as determinaciones que hace el juzgador de los hechos no deben ser sustituidas por el criterio del foro apelativo, a menos que de la prueba admitida surja que no existe base suficiente que apoye tal determinación". *Pueblo v. Irizarry Irizarry*, *supra*, pág. 816. Véase, *Pueblo v. Toro Martínez*, *supra*.

Ahora bien, dicha regla no es absoluta ni se aplica de forma irreflexiva. Por consiguiente, si un examen cuidadoso de la prueba no establece la culpabilidad del acusado más allá de duda razonable, procede revocar el fallo condenatorio. *Pueblo v. Irizarry Irizarry*, *supra*, pág.816; *Pueblo v. Cabán Torres*, *supra*, pág.655; *Pueblo v. Carrasquillo Carrasquillo*, *supra*, pág. 551.

Es, pues, a la luz de la normativa antes expuesta que procedemos a disponer de la controversia ante nos.

VI.

Como mencionáramos anteriormente, en el presente caso, la Oficina del Procurador General arguye que el Tribunal de Apelaciones erró al determinar que las dos (2) armas de fuego ocupadas, y relacionada a los delitos imputados a los señores Henríquez Rivera y Urbáez Mateo, eran inadmisibles, a pesar de que mostraban íntegramente su número de serie. Además, señala que el tribunal *a quo* erró al descartar la credibilidad otorgada por el foro primario al testimonio de los agentes, sustituyendo injustificadamente la apreciación de la prueba del juzgador de los hechos. En gran parte, le asiste la razón.

**Y es que, según surge del expediente y la transcripción de la prueba oral ante nuestra consideración, las dos (2) armas ocupadas durante la intervención con los señores Henríquez Rivera y Urbáez Mateo mostraban números de serie fácilmente legibles.** Por lo tanto, durante sus testimonios, dichos agentes identificaron las respectivas armas e indicaron que lo hacían, en parte, por las enumeraciones antes mencionadas. Siendo estos objetos fácilmente identificables -- por tener números de serie únicos -- establecer la cadena de custodia no era absolutamente necesario para su admisibilidad. Esto, aun cuando en el caso de marras la cadena de custodia fue suficientemente demostrada. En ese sentido, le correspondía al Tribunal de

Primera Instancia aquilatar el peso de cualquier lapso en la cadena de custodia de la evidencia pertinente; proceso que dicho foro realizó de una manera correcta y adecuada, y que dio paso a la admisión en evidencia de las referidas armas.

Por otra parte, en lo relacionado a la apreciación de la prueba por parte del foro sentenciador, se desprende de la transcripción de la prueba oral ante nos que los Agentes Arocho Torres, Rivera Vélez y Sánchez Ramos proveyeron una narración detallada de los hechos, las cuales fueron fundamentalmente coherentes entre sí. A pesar de existir contradicciones menores entre los testimonios de referencia, todos coincidieron en cuanto a los motivos fundados para detener el vehículo, la presencia de las latas de cerveza y armas en la escena, la aglomeración de personas en la localización, la huida del pasajero delantero y la confrontación con el señor Henríquez Rivera.

Cónsono con lo anterior, el Tribunal de Primera Instancia no estimó que dichos testimonios eran flacos y descarnados, ni irreales o improbables. Así pues, evaluada la prueba oral, y tomando en cuenta que el foro primario escudriñó directamente el testimonio vertido durante el juicio, consideramos impropio intervenir con la apreciación de los hechos del foro primario en el presente caso. Ello, al no estar presente ninguna de las circunstancias que ameritarían la intervención de esta Curia, a saber, pasión, prejuicio o error manifiesto.

Ahora bien, no empece a lo antes expuesto, es menester señalar aquí que la culpabilidad del señor Urbáez Mateo -- en lo pertinente al cargo de posesión con intención de distribuir, es decir, Art. 401 de la Ley de Sustancias Controladas de Puerto Rico, *supra* -- no fue probada más allá de duda razonable. Durante el juicio, si bien la prueba demostró que el señor Urbáez Mateo poseyó doce (12) bolsitas que contenían picadura de marihuana, no se presentó evidencia en cuanto a la intención de distribuir dicha sustancia controlada.[12] De la relación de hechos no surge razón para deducir que ese era el caso, ya que no fue arrestado ejecutando una transacción ni fue hallado con una cantidad significativa de sustancia ilícita, sino que únicamente se le encontró en posesión de la misma. Como consecuencia, al no presentarse prueba en cuanto al elemento de intencionalidad, procedía encontrar culpable al señor Urbáez Mateo por infracción al Art. 404 de la Ley de Sustancias Controladas, *supra*, a saber, posesión; no así por posesión con intención de distribuir.

Siendo ello así, se cometieron, en parte, los errores señalados. Procede, pues, dictar la correspondiente Sentencia.

VII.

---

[12] Según surge del expediente del caso, la cantidad de marihuana ocupada sumaba 11.53 gramos.

Por los fundamentos antes expuestos, revocamos la *Sentencia* emitida por el Tribunal de Apelaciones. En el caso del señor Henríquez Rivera, reinstalamos la determinación del foro primario, mientras que en el caso del señor Urbáez Mateo, reinstalamos el dictamen del Tribunal de Primera Instancia, modificando el fallo de acuerdo con lo antes expuesto en lo relacionado al Art. 401 de la Ley de Sustancias Controladas de Puerto Rico, *supra*, y devolvemos el caso a dicho foro para la continuación de los procedimientos conforme a lo aquí resuelto.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Rivera García emitió una Opinión de Conformidad a la que se unió la Jueza Asociada señora Pabón Charneco. La Jueza Presidenta Oronoz Rodríguez emitió una Opinión de Conformidad en parte y disidente en parte.

José Ignacio Campos Pérez
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| El Pueblo de Puerto Rico<br><br>Peticionario<br><br>v.<br><br>Héctor Henríquez Rivera<br><br>Recurridos | | |
| El Pueblo de Puerto Rico<br><br>Peticionario<br><br>v.<br><br>Yicauri Urbáez Mateo<br><br>Recurridos | CC-2019-0645 | *Certiorari* |

**El Juez Asociado señor RIVERA GARCÍA emitió la Opinión de Conformidad, a la cual se unió la Jueza Asociada señora Pabón Charneco.**

En San Juan, Puerto Rico, a 28 de septiembre de 2020.

Reconozco, y así lo he expresado previamente, que la apreciación de la prueba testifical a nivel apelativo parece generar un dilema al aplicar el estándar de revisión. Como consecuencia, debo emitir unas breves expresiones ante la constante práctica de los foros apelativos de revocar condenas bajo la premisa de que los testimonios prestados en el foro primario son estereotipados. Véase, *e.g.,* Sentencia, pág. 12.

Una vertiente del referido dilema se produce ante nuestros pronunciamientos en cuanto a que un testimonio perfecto debe producir sospecha y, de caer dentro de lo que hemos denominado testimonio estereotipado, debe escudriñarse con rigor especial hasta el punto de poderse descartar por el juzgador. Pueblo v. Almodóvar, 109 DPR 117, 124 (1979); Pueblo v. González de Valle, 102 DPR 374, 378 (1974).[13]

No obstante, no se puede ignorar que la doctrina para la valoración de un testimonio estereotipado se fundamenta en la naturaleza de lo declarado —qué declaró y cómo lo declaró— por el testigo. Véanse: Pueblo v. Rivera Rodríguez, 123 DPR 467, 480 (1989) ("Testimonio estereotipado es aquel que se reduce a establecer los elementos mínimos necesarios para sostener un delito sin incluir detalles imprescindibles para reforzarlo"); Pueblo v. González de Valle, supra, pág. 378 ("el testimonio estereotipado puede perder su condición de tal si, yendo más allá de los datos indispensables para probar los requisitos mínimos de un delito, se le rodea de las circunstancias en que funciona el agente, el término de su investigación, los resultados obtenidos fuera del caso en trámites y otros detalles"). Por ello se ha establecido la necesidad de ser más rigurosos en su evaluación, pudiendo el tribunal al identificarlo restarle el valor que razonablemente corresponda. A modo ilustrativo, esto se debe a que lo que

---

[13] Los casos de evidencia abandonada o lanzada al suelo, así como los casos en que se descubrió prueba u observó un evento ilegal a plena vista son escenarios que inducen sospecha sobre la posible existencia de un testimonio estereotipado. Pueblo v. González de Valle, 102 DPR 374, 378 (1974).

declara el testigo es tan perfecto que tiende a demostrar la existencia de elementos de fabricación o falsedad en el testimonio. Pueblo v. Camilo Meléndez, 148 DPR 539, 558 (1999).

Ahora bien, la perfección de la declaración por sí sola no es suficiente para catalogarla estereotipada. Hace falta un elemento adicional. Es indispensable que se trate de una declaración repetida, común, superficial, pero a la vez tan idónea que resulta difícil de creer. Pueblo v. González de Valle, *supra*, pág. 377. Así pues, la señal más patente para reconocer un testimonio estereotipado es la carencia de elementos ajenos a aquella declaración típica que se realiza en ese tipo de casos en nuestros tribunales. Pueblo v. Acevedo Estrada, 150 DPR 84 (2000); Pueblo v. Almodóvar, *supra*; Pueblo v. Espinet Pagán, 112 DPR 531, 537 (1982). Esto es, que el testigo aporte sólo los elementos mínimos de la causa de acción o la doctrina que se persigue activar. Pueblo v. Acevedo Estrada, *supra*, pág. 93; Pueblo v. Rivera Rodríguez, *supra*, pág. 480. Véase, además, Pueblo v. Espinet Pagán, *supra*, pág. 537. Finalmente, corresponde al juzgador determinar qué versión creyó y adjudicar de conformidad con esa apreciación.

Precisamente, a nivel revisor, el denominado testimonio estereotipado exige una deliberación más cuidadosa ante la posición restringida que se ostenta en comparación con el juzgador en el foro primario. Esto es así porque, si bien nos hemos expresado sobre esta doctrina al revisar condenas criminales, debemos ser conscientes de que la función de un

tribunal apelativo es pasar juicio sobre la decisión del tribunal revisado siguiendo los parámetros o estándares que se reiteran en la Sentencia.

El hecho de que hubiéramos llegado a una conclusión distinta al evaluar el testimonio frío y plano que surge de una transcripción no nos faculta para sustituir el criterio del juzgador de los hechos. No debemos olvidar que tanto ante presuntos testimonios estereotipados ——como en aquellos escenarios en que a nivel revisor identifiquemos contradicciones de dos o más testigos—— **sigue viva la premisa de que el juzgador en el tribunal de instancia observó a los testigos y cómo declararon**. Por consiguiente, la revisión de la adjudicación de credibilidad de un testigo nos **merecerá igual deferencia** y sólo procede sustituir el criterio del tribunal de instancia cuando se nos demuestre que fue producto de algún tipo de parcialidad o es un error craso o manifiesto. Después de todo, dada la naturaleza de la doctrina establecida para auscultar testimonios estereotipados, **el juzgador de los hechos en instancia sigue estando en mejor posición para efectuar la evaluación de mayor rigor que hemos exigido en estos casos y valorar la prueba conforme su mejor criterio**. Véase Pueblo v. Rivera Rodríguez, *supra*.

En ese sentido, los factores con que se deben evaluar los presuntos testimonios estereotipados son parámetros dirigidos esencialmente para ser aplicados por los juzgadores en el Tribunal de Primera Instancia, quienes tienen ante sí el

testigo declarando. **Para propósitos de los foros revisores, el estándar de revisión de la valoración de la prueba es uno guiado por la deferencia a la valoración de la prueba. Ello tiene como excepción, únicamente, los escenarios en que se demuestra la existencia de pasión, prejuicio, parcialidad o un error manifiesto**. Pueblo v. Toro Martínez, 200 DPR 834, 858 (2018).

En este caso, la modificación del fallo contra uno de los recurridos está fundamentada en la ausencia de prueba más allá de duda razonable sobre uno de los elementos de los delitos imputados. Véase Pueblo v. Casillas, Torres, 190 DPR 398 (2014) (resuelto en la misma dirección). No estamos sustituyendo el criterio del foro primario sobre la credibilidad o confiabilidad de los testimonios brindados por los testigos, distinto a lo que hizo, sin justificación, el Tribunal de Apelaciones. Véase Sentencia, págs. 12-13.

Edgardo Rivera García
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| El Pueblo de Puerto Rico<br><br>Peticionario<br><br>v.<br><br>Héctor Henríquez Rivera<br><br>Recurrido<br><br>_____<br><br><br>El Pueblo de Puerto Rico<br><br>Peticionario<br><br>v.<br><br>Yicauri Urbáez Mateo<br><br>Recurrido | CC-2019-0645 | *Certiorari* |

La Jueza Presidenta ORONOZ RODRIGUEZ emitió una Opinión de conformidad en parte y disidente en parte.


En San Juan, Puerto Rico, a 28 de septiembre de 2020.

> "Everyone has the right to liberty and security of person. No one shall be subjected to arbitrary arrest or detention. No one shall be deprived of his liberty except on such grounds and in accordance with such procedures as are established by law". – Res. A. G. 2200 A, *Pacto Internacional de Derechos Civiles y Políticos*, Art. 9(1) (16 dic. 1966).

Toda persona tiene el derecho a disfrutar de su libertad, así como de tener la seguridad de que sus derechos fundamentales serán protegidos frente el poder del Gobierno.

Se trata de un principio cardinal en la dignidad del ser humano. Por ello, ante la amenaza de una privación a esa libertad, el Estado se debe regir estrictamente por los parámetros que establecen nuestras normas jurídicas, bajo las circunstancias excepcionales que dicta nuestro ordenamiento. Toda desviación de ese principio se debe escrudiñar celosa y minuciosamente por los tribunales de nuestro País. Es nuestra responsabilidad como intérpretes y garantes de esos derechos.

En la Sentencia que se dictó hoy, este Tribunal pasó juicio sobre las condenas que el Tribunal de Primera Instancia le impuso a los señores Héctor Henríquez Rivera y Yicauri Urbáez Mateo. Por entender que esta Curia actuó correctamente al sostener la condena del señor Henríquez Rivera, estoy conforme con ese dictamen. Empero, disiento enérgicamente del proceder de este Tribunal al mantener la condena del señor Urbáez Mateo.

Al señor Urbáez Mateo se le realizó un arresto sin orden judicial para el cual no existían motivos fundados. Al amparo de la regla de exclusión de evidencia que consta en nuestra Constitución, procedía declarar inadmisible la prueba que se le ocupó a raíz de ese arresto ilegal. Suprimida esa evidencia, sus condenas por las infracciones al Art. 5.04 de la Ley de Armas de Puerto Rico, _infra_, y el Art. 401 de la Ley de Sustancias Controladas de Puerto Rico, _infra_, no se sostienen.

El Tribunal de Apelaciones actuó correctamente al revocar esa condena, y lo que procedía era que confirmáramos esa Sentencia en cuanto al señor Urbáez Mateo.

I

En este caso, tres agentes de la Policía intervinieron durante horas de la noche con el vehículo de motor en el que se encontraban los acusados –el señor Henríquez Rivera (conductor del vehículo) y el señor Urbáez Mateo (pasajero en la parte posterior)– y un tercer sujeto sin identificar (pasajero delantero). Según el testimonio del agente Arocho Torres y del agente Rivera Vélez, los agentes decidieron intervenir con el vehículo pues notaron que los cristales estaban sumamente oscuros. Entendieron que tenían motivos para creer que el vehículo transitaba en violación a la Ley de Vehículos y Tránsito de Puerto Rico, Ley Núm. 22-2000, 9 LPRA sec. 5001 et seq. (Ley de Tránsito).

El agente Arocho Torres declaró que luego de solicitarle al conductor –entiéndase, al señor Henríquez Rivera– la documentación de rigor, observó que este tenía una lata de cerveza en la mano. Testificó, además, que el señor Henríquez Rivera tenía los ojos rojizos, expedía olor a licor y que hablaba incoherentemente. Ante esas señales, el agente Arocho Torres tuvo motivos para creer que el señor Henríquez Rivera cometía un delito al conducir un vehículo en estado de embriaguez. Por ello, procedió a solicitarle que apagara el vehículo y se desmontara, con la intención de leerle las

advertencias correspondientes y arrestarlo. El agente declaró que mientras ayudaba al señor Henríquez Rivera a desmontarse, el pasajero delantero abrió la puerta y emprendió carrera hacia los edificios del Residencial Francisco Figueroa.

Mientras esto ocurría, el señor Urbáez Mateo estaba sentado en el asiento posterior del vehículo con una cerveza en la mano. El agente Rivera Vélez declaró que se encontraba posicionado en el lado izquierdo del vehículo. Por ello, este último estaba en una posición que le permitía vigilar al señor Urbáez Mateo. A preguntas del fiscal sobre qué le llamó la atención al agente Rivera Vélez del señor Urbáez Mateo, este respondió: "En ese momento solamente nada que tenía una cerveza en la mano".[14]

Los tres agentes testificaron que, una vez el señor Henríquez Rivera se encontraba fuera del vehículo, comenzó un forcejeo entre este y el agente Arocho Torres. Durante el forcejeo, el agente Rivera Vélez le solicitó al señor Urbáez Mateo que dejara las manos donde él pudiera verlas. En específico, el agente Rivera Vélez declaró:

> Yo rápidamente le grito al pasajero posterior que es el caballero Yicauri Urbaez Mateo que deje las manos donde yo pueda verlas, porque ya había observado que había uno corriendo con una actitud sospechosa para nosotros, pasa este, está pasando esta situación con el compañero Arocho y el conductor pues yo le grito a este, a este pasajero posterior "deja las manos donde yo pueda verlas".[15]

El agente Rivera Vélez no indicó que existiera indicio alguno de que el señor Urbáez Mateo haya desobedecido la

---

[14] *Transcripción de vista oral*, Apéndice, pág. 232.
[15] Íd., pág. 233.

orden. De hecho, el agente testificó que mientras se desarrollaba el altercado, el señor Urbáez Mateo permanecía "sin cometer delito sentado en la parte posterior del auto".[16]

Mientras, el señor Henríquez Rivera y el agente Arocho Torres continuaban el forcejeo. El señor Henríquez Rivera empujó al agente Arocho Torres, a medida que este último lo agarró entre la cintura y la mano derecha con la intención de llevarlo al piso para arrestarlo. En ese ínterin, los agentes vieron que un arma de fuego se desprendió de la cintura del señor Henríquez Rivera y cayó al piso. Esto provocó que el agente Arocho Torres advirtiera a sus compañeros la presencia de una pistola. Consecutivamente, el agente Arocho Torres soltó al señor Henríquez Rivera y ocupó inmediatamente el arma de fuego, acto conocido al momento por los otros dos agentes que testificaron. Quedó estipulado que los agentes conocían además que el arma que se cayó al piso se desprendió de la cintura del señor Henríquez Rivera.

El agente Rivera Vélez declaró que inmediatamente vio caer el arma de la cintura del señor Henríquez Rivera, le ordenó al señor Urbáez Mateo que se desmontara del vehículo. Mientras este último acataba la orden, el agente Rivera Vélez lo agarró por el brazo izquierdo y le informó que estaba arrestado. Sobre el particular, el agente Rivera Vélez declaró:

> Arocho continúa ese forcejeo y cae un arma de, de color negro al piso. El agente Arocho grita "pistola" y entonces eh ese joven que resultó ser

---

[16] Íd., pág. 274. (Énfasis suplido).

Héctor Henríquez sale corriendo hacia la parte delantera del auto para internarse entre los edificios del Residencial Francisco Figueroa, yo le informo al pasajero posterior que es el joven Yicauri Urbaez Mateo que se desmonte, cuando este se está desmontando yo lo sujeto por el brazo izquierdo y le informo que está arrestado porque ya había visto la evidencia delictiva con relación al arma de fuego que, que estaba el compañero Arocho inclusive la, la recoge del, del suelo.[17]

Sobre los motivos que tuvo el agente Rivera Vélez para efectuar el arresto del señor Urbáez Mateo, el fiscal le preguntó directamente al agente:

FISCAL COLÓN: "Okey, le pregunto en ese momento explíquele a su señoría, si va a efectuar un arresto y por qué usted iba a efectuar un arresto en ese momento contra esa persona [Urbáez] explíquele a su señoría".

[AGENTE RIVERA]: "Porque ya había observado evidencia delictiva en el sentido de que había habido un forcejeo, en ese forcejeo se había despren, se había deslizado un arma de fuego de color negra que fue la que cayó al piso de la parte delantera del cuerpo de Héctor Henríquez".

FISCAL COLÓN: "Okey. Y en ese momento que usted lo arresta, qué procedió con relación al arresto hacer una vez usted lo tiene esposado".

[AGENTE RIVERA]: "Ejerzo fuerza, llevo sus manos a la parte posterior —como ya mencioné— y le pongo los grilletes y re, por su seguridad y la nuestra realizo un registro.[18]

---

[17] Íd., pág. 233-234. (Énfasis suplido).

[18] Íd., pág. 234. Por su parte, el agente Sánchez Ramos testificó que se dirigió a ayudar al agente Rivera Vélez a arrestar al señor Urbáez Mateo. Esto pues, a su juicio, Urbáez Mateo "estaba hostil". Íd., pág. 307. Sin embargo, el agente Sánchez Ramos no describió a qué se refería con "hostil". El agente Rivera Vélez fue quien describió en el juicio la conducta del señor Urbáez Mateo mientras efectuaba el arresto. Declaró que este último estaba sentado en el asiento trasero del vehículo cuando le indicó que se desmontara. **Mientras Urbáez Mateo se desmontaba, el agente Rivera Vélez lo agarró por el brazo izquierdo y le informó que estaba arrestado.** Indicó que, acto seguido, Urbáez Mateo "tens[ó] su brazo izquierdo y emple[ó] resistencia activa" del brazo. Íd., pág. 234. Adujo, además, que Urbáez Mateo asumió "una posición doblado hacia el frente". Íd. Añadió que luego "empezó con los movimientos laterales con, con sus piernas", razón por la cual el agente Rivera Vélez inmediatamente lo tiró contra el piso, donde primero cayó de rodillas y luego cayó completamente. Íd. En ese momento, le puso los grilletes en sus muñecas. Íd.

El agente Rivera Vélez fue enfático en afirmar en múltiples ocasiones durante el juicio que la razón por la que entendió tener motivos fundados para arrestar al señor Urbáez Mateo fue porque al señor Henríquez Rivera se le cayó una pistola durante su forcejeo con el agente Arocho Torres. Sobre el particular, declaró:

> FISCAL COLÓN: Con relación a, a Yicauri, usted infor, le dijo al compañero abogado que en el momento en que el agente Arocho estaba interviniendo él no estaba (inteligible) del[…]
>
> [AGENTE RIVERA]: Correcto.
>
> FISCAL COLÓN: Por qué usted lo arresta entonces, por qué usted le lo baja del vehículo, explíquele a su señoría.
>
> [AGENTE RIVERA]: Yo le ordeno bajar al joven porque está sentado en el asiento posterior que resultó ser Yicauri Urbáez Mateo, porque ya yo le vi, había visto una evidencia delictiva con relación al arma de fuego que cayó en el, en el suelo, una vez el compañero César Arocho está forcejeando con Héctor Henríquez. Ya al ver una evidencia delictiva, un arma de fuego en el lugar eh se le ordena bajar a este, a este joven y se le informa que está arrestado.[19]

A eso, el abogado de defensa le cuestionó al agente Rivera Vélez:

> [ABOGADO]: Usted dice que vio evidencia delictiva pero en realidad es que la evidencia que, delictiva que usted observó no tenía nada que ver con Yicauri, ¿verdad que no?
>
> [AGENTE RIVERA]: Eh estaba…
>
> [ABOGADO]: ¿Verdad que no?
>
> [AGENTE RIVERA]: Directamente relacionada con Yicauri no.[20]

---

[19] Íd., pág. 297. (Énfasis suplido).
[20] Íd.

Congruente con lo anterior, el agente Rivera Vélez admitió en varias ocasiones que no había visto al señor Urbáez Mateo incurriendo en conducta delictiva en ningún momento antes de arrestarlo. En el interrogatorio, expresó:

[ABOGADO]: "¿Usted lo vio con algún deli, arma en la mano?"

[AGENTE RIVERA]: "No, no".

[ABOGADO]: "**¿Cometiendo algún delito?**"

[AGENTE RIVERA]: "**No señor**".

[ABOGADO]: "**Pero lo arrestó como quiera**".

[AGENTE RIVERA]: "**Es así**".[21]

Luego de ponerle los grilletes al señor Urbáez Mateo, el agente Rivera Vélez le realizó un registro superficial sobre su *jacket* y "por el interior de su Mahón en el extremo derecho delantero" en donde palpó un objeto sólido.[22] Al verificar, encontró que se trataba de un arma de fuego color níquel y negro. Al continuar el registro, encontró "una bolsa plástica transparente de cierre a presión con muchas bolsitas plásticas transparentes de cierre a presión con supuesta picadura [de marihuana] en su interior".[23]

Durante el interrogatorio, los tres agentes manifestaron que, desde que inició la intervención del vehículo, un grupo de personas se aglomeró en la cercanía. Los agentes indicaron que esa situación les hizo sentir inseguros. El agente Sánchez Ramos declaró que las personas procedieron a "gritar

---

[21] Íd., págs. 273-274. (Énfasis suplido).
[22] Íd., pág. 234.
[23] Íd., pág. 235.

improperios hacia [los agentes] y palabras soeces".[24] Por ello, indicó que ambiente era hostil.[25] Por su parte, el agente Rivera Vélez indicó que no tuvieron la oportunidad de intervenir con las personas que le gritaban improperios pues "ninguno tuvo la valentía de gritár[les] de frente, lo gritaban a la periferia".[26]

Por esos hechos, se acusó al señor Urbáez Mateo de infringir el Art. 5.04 (portación y uso de armas de fuego sin licencia) de la Ley de Armas de Puerto Rico, Ley Núm. 404-2000, 25 LPRA sec. 458c (derogada), y el Art. 401 de la Ley de Sustancias Controladas de Puerto Rico, Ley Núm. 4 del 23 de junio de 1971, 24 LPRA sec. 2401(a)(1), en la modalidad de poseer una sustancia controlada con intención de distribuir. El juicio se vio por tribunal de derecho y el señor Urbáez Mateo fue declarado culpable de los delitos.[27]

---

[24] Íd., pág. 309.
[25] Sobre el particular, el agente Rivera Vélez declaró:

> [H]ubieron personas de una actitud hostil manifestando palabras soeces en el lugar, el ambiente estaba pues rodeado de personas que se acumularon cerca de allí en reclamando por qué se interviene con estos, con estos, con estas personas eh ya que estaban cerca de, del lugar de la intervención.

Íd., pág. 232. A preguntas del abogado de la defensa, el agente Rivera Vélez declaró que no se arrestó a nadie en los alrededores del vehículo por obstrucción a la justicia ni por alteración de la paz. Íd., pág. 253. Indicó que, si alguien le hubiese gritado de frente, entonces "en vez de ser dos arrestados […] hubiesen [sido] tres". Íd., pág. 254.
[26] Íd., pág. 254.
[27] Se acusó también al señor Henríquez Rivera por infringir los Arts. 5.04 (Portación y uso de armas de fuego sin licencia) y 6.01 (Fabricación, distribución, posesión y uso de municiones) de la Ley de Armas de Puerto Rico, Ley Núm.404-2000, 25 LPRA sec.458c y 459 (derogada); Arts. 192 (Recibo, disposición y transportación de bienes objetos del delito), 245 (Empleo de violencia o intimidación contra la autoridad pública) y 246 (Resistencia u obstrucción a la autoridad pública) del Código Penal de Puerto Rico de 2012, 33 LPRA 5262, 5335 y 5336; y Art. 7.02 (Manejo de vehículos de motor bajo los efectos de bebidas embriagantes) de la Ley de Vehículos y Tránsito de Puerto Rico, Ley Núm.22-2000, 9 LPRA sec.5202. El Tribunal de Primera Instancia encontró al señor Henríquez Rivera culpable

El Tribunal de Apelaciones revocó las sentencias que se dictaron contra ambos acusados. Sobre la condena del señor Urbáez Mateo, el foro apelativo intermedio determinó que el agente Rivera Vélez no tuvo motivos fundados para efectuar el arresto. Concluyó que, según el testimonio de este último en juicio, arrestó al señor Urbáez Mateo porque al señor Henríquez Rivera se le cayó un arma de fuego de su cintura. El Tribunal de Apelaciones hizo alusión a las ocasiones constantes en que el agente Rivera Vélez admitió ese hecho.

El foro apelativo intermedio determinó –entre varios fundamentos que no son necesarios mencionar en este momento– que el Ministerio Público no logró rebatir la presunción de ilegalidad en el registro y arresto que se realizó sin orden judicial previa. Por lo tanto, en cuanto al señor Urbáez Mateo, el Tribunal de Apelaciones dictaminó:

> [C]oncluimos que no se demostró que los agentes tuvieran motivos fundados para intervenir con los apelantes sin una orden judicial a esos efectos. El mismo agente Rivera testificó que no vio al señor Urbáez Mateo cometiendo delito alguno, y que la evidencia delictiva que dio pie a su registro y arresto no estaba directamente relacionada a él; por lo que no existían motivos fundados para intervenir con él, registrarlo y arrestarlo sin orden judicial a esos efectos. […] El Ministerio Público no logró rebatir la presunción de ilegalidad en los registros y arrestos hechos sin orden judicial previa. Por tanto, toda la evidencia ocupada como fruto de ello y los arrestos hechos fueron ilegales e inadmisibles como prueba en juicio.[28]

---

por todos los delitos por los que se le acusó, con excepción del cargo por violación al Art.192 del Código Penal de 2012.
[28] *Sentencia*, Apéndice, pág. 442.

En desacuerdo, el Procurador General presentó el recurso de *certiorari* que atendemos hoy. Particularmente, sobre los motivos fundados que tuvo el agente Rivera Vélez para arrestar al señor Urbáez Mateo adujo:

> [El agente Rivera] le informa al señor Urbáez que está bajo arresto, pues había portación de arma [del señor Henríquez]. Además, de la presencia de un arma de fuego, la conducta fue altamente sospechosa cuando el conductor y el otro pasajero salieron corriendo hacia el residencial. Por tanto, se hacía necesaria la intervención con el último ocupante del auto. Ante la presencia del arma [que se le cayó a Henríquez] había que velar por la seguridad.[29]

II

La Constitución de Puerto Rico garantiza a cada ciudadana y ciudadano la protección de su persona, casa, papeles y efectos contra registros, incautaciones y allanamientos irrazonables. Const. ELA, Sec. 10, Art. II, LPRA, Tomo 1. Esta protección encuentra arraigo en la Enmienda Cuarta de la Constitución de los Estados Unidos. Emda. IV, Const. EE. UU., LPRA, Tomo 1. De ordinario, nuestra Carta Magna prohíbe que se arreste a una persona sin una orden judicial previa que se base en una determinación de causa probable. Pueblo v. Colón Bernier, 148 DPR 135, 140 (1999). Como norma general, la evidencia que se ocupe como fruto de un arresto sin orden judicial previa está sujeta a la regla de exclusión, incorporada expresamente en la Sección 10 de nuestra Carta de Derechos. Const. ELA, supra ("Evidencia obtenida en violación de esta sección será inadmisible en los tribunales"). No

---

[29] *Certiorari*, pág. 8.

obstante, la Regla 11 de Procedimiento Criminal, 34 LPRA Ap. II, R. 11, permite a manera de excepción que un funcionario del orden público realice un arresto sin orden judicial únicamente en las circunstancias siguientes:

> (a)  Cuando tuviere motivos fundados para creer **que la persona que va a ser arrestada ha cometido un delito en su presencia** […].

> (b)  Cuando **la persona arrestada** hubiera cometido **delito grave**, aun cuando no sea en su presencia.

> (c) Cuando tuviere motivos fundados para creer que **la persona que va a ser arrestada ha cometido un delito grave**, independientemente de si el delito se hubiere cometido o no en realidad. (Énfasis suplido).

La frase *motivos fundados* que menciona la regla se refiere a aquella información o conocimiento que lleven a una persona ordinaria y prudente a creer que la persona a ser detenida ha cometido un delito. Pueblo v. Serrano, Serra, 148 DPR 173 (1999). Ello es sinónimo de *causa probable*. Pueblo v. Díaz Díaz, 106 DPR 348 (1977). Los *motivos fundados* constituyen el mínimo de información que razonablemente podría convencer a un juez de que existe *causa probable* para expedir una orden de arresto. Pueblo v. Calderón Díaz, 156 DPR 549 (2002). Por ello, el agente que realice un arresto sin la orden correspondiente debe observar o estar informado de "hechos concretos que razonablemente apunten a la comisión de un delito", pues las "[m]eras sospechas no bastan". Pueblo v. Colón Bernier, supra, pág. 144. Para determinar si un agente tenía motivos fundados para intervenir y arrestar a un ciudadano sin orden previa, es indispensable analizar la

información que le constaba a este y los hechos que tenía ante sí al momento del arresto para, entonces, determinar si esos hechos podían llevar a una persona prudente y razonable a creer que la persona a ser arrestada había cometido, o iba a cometer, un delito.

En el contexto de una infracción de tránsito, hemos reiterado que un agente puede detener a un conductor de un vehículo si tiene "un motivo o sospecha individualizada de que el conductor ha infringido una ley de tránsito". Ortiz v. DTOP, 164 DPR 361, 366 (2005). Nótese que la "mera infracción de tránsito de por sí no justifica un registro sin orden, aunque valida la detención inicial del vehículo". Pueblo v. Malavé González, 120 DPR 470, 480 (1988). Ahora bien, la detención por motivo o sospecha individualizada de que se ha infringido una ley de tránsito no constituye fundamento suficiente que justifique un arresto sin orden. Lo anterior, pues la Regla 11 de Procedimiento Criminal, supra, permite el arresto sin orden ante la creencia *de comisión **de delito*** y no así de una falta administrativa cuya sanción constituye imponer una multa. Por ende, y a modo de ejemplo, un agente no puede tener motivos fundados para arrestar a un conductor únicamente porque no llevara puesto el cinturón de seguridad. Esto pues, al amparo de las leyes de tránsito, las faltas administrativas "que no conlleven pena de reclusión […] no han sido consideradas propiamente delitos". Pueblo v. Báez Cartagena, 108 DPR 381, 389 (1979) (Juez Presidente Trías Monge, Voto particular). Cónsono con este planteamiento, la

Ley de Tránsito vigente no faculta a un agente del orden público a realizar un arresto ante la creencia de que se ha cometido una falta administrativa. No obstante, hemos expresado que si como producto de una detención legal de un vehículo surgiere motivo fundado para creer que se cometió o se está cometiendo *un delito* en presencia del agente, este puede efectuar un arresto o registro conforme a la ley. Pueblo v. Malavé González, supra, pág. 481.

Al evaluar la legalidad del arresto de una persona sin la orden judicial correspondiente un tribunal debe juzgar la conducta del funcionario público que arresta en consideración al criterio de la persona prudente y razonable, tomando en cuenta las circunstancias específicas del arresto. Pueblo v. Alcalá Fernández, 109 DPR 326 (1980). Sin embargo, la jurisprudencia federal ha reiterado que la consideración de la causa probable para arrestar sin orden al amparo de la Enmienda Cuarta —bajo nuestro ordenamiento, los *motivos fundados*— es **particularizada a la persona que se arresta**. Ybarra v. Illinois, 444 US 85, 91 (1979). De esa forma, en US v. Di Re, 332 US 581 (1948), el Tribunal Supremo federal se negó a permitir que se admitiera en evidencia material inculpatorio que se obtuvo de un pasajero de un vehículo, basado en una confidencia de que **otro de los pasajeros tenía consigo material de contrabando**. El Máximo Foro federal razonó que la causa probable solo existía para el individuo sobre el cual se recibió la confidencia y, posteriormente, surgió para un tercero a quien el policía vio con material de

contrabando en su persona. Por lo tanto, todo material que se obtuvo incidental al arresto del ocupante restante del vehículo era inadmisible en un tribunal, pues fue producto de un arresto ilegal.[30]

De esa forma, el Tribunal Supremo federal también especificó que **un agente no puede inferir el surgimiento de causa probable después de efectuar el arresto basado en si el arrestado se resistió al arresto o si lo acató con su silencio**. Íd., pág. 594. Sobre el particular, añadió: "**One has an undoubted right to resist an unlawful arrest, and courts will uphold the right of resistance in proper cases**". Íd. (Énfasis suplido). El Tribunal expresó además: "It is the officer's responsibility to know what he is arresting for, and why, and one in the unhappy plight of being taken into custody is not required to test the legality of the arrest before the officer who is making it". Íd., pág. 595.

Posteriormente, en Ybarra v. Illinois, supra, el Tribunal Supremo federal se volvió a enfrentar a un asunto similar, esta vez ante un registro con orden judicial en un establecimiento. Existía causa probable para pensar que allí

---

[30] En específico, el Tribunal Supremo federal dictaminó:

> The Government now concedes that the only person who committed a possible misdemeanor in the open presence of the officer was Reed, the Government informer who was found visibly possessing the coupons. Of course, as to Buttitta they had previous information that he was to sell such coupons to Reed, and Reed gave information that he had done so. But the officer had no such information as to Di Re. All they had was his presence, and if his presence was not enough to make a case for arrest for a misdemeanor, it is hard to see how it was enough for the felony of violating § 28 of the Criminal Code.

US v. Di Re, 332 US 581, 592 (1949).

había contrabando de sustancias controladas. Como producto de esa intervención, se arrestó a un individuo que estaba parado en el área de la barra y se le ocuparon seis paquetes pequeños con heroína, los cuales se encontraban dentro de una caja de cigarrillos que tenía en su persona. El Tribunal Supremo federal revocó la condena y expresó:

> **[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person. Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person**. This requirement **cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another** or to search the premises where the person may happen to be. The Fourth and Fourteenth Amendments protect the "legitimate expectations of privacy" of persons […]. Íd., pág. 21 (Énfasis suplido).

El caso es distinto cuando un agente descubre evidencia delictiva en un vehículo legalmente, pero se desconoce a quién le pertenece. En ese supuesto, el Tribunal Supremo federal ha validado la existencia de causa probable para arrestar a todos los ocupantes del vehículo, pues hay motivos para pensar que cualquiera de ellos, o todos, podrían ser responsables del delito o delitos que surjan a raíz de esa evidencia. Maryland v. Pringle, 540 US 366 (2003).

Los fundamentos que anteceden se encuentran en armonía con nuestro ordenamiento legal estatal. La Regla 11 de Procedimiento Criminal, supra, dicta expresamente en sus tres incisos que los motivos fundados para creer que se cometió un delito **son en torno a la persona que va a ser arrestada**.

Finalmente, hemos reiterado que un *arresto* constituye "el acto de poner a una persona bajo custodia en los casos y del modo que la ley autoriza[, y que] se hará por medio de la restricción efectiva de la libertad de la persona o sometiendo a dicha persona a la custodia de un funcionario". Pueblo en interés del menor NOR, 136 DPR 949, 957 (1994) (citando a Pueblo v. Pacheco Báez, 130 DPR 664, 668-669 (1992)); Regla 4 de Procedimiento Criminal, 34 LPRA Ap. II, R. 4. Sobre el particular, hemos expresado que se considera que "**una persona ha sido arrestada**, a la luz de la Cuarta Enmienda Constitucional Federal, **s[o]lo si**, tomando en cuenta la totalidad de las circunstancias que rodean al incidente entre la Policía y el presunto arrestado, **una persona razonable hubiese creído que no estaba en libertad de poder marcharse del lugar**". Íd., pág. 958. (Énfasis suplido). Véase US v. Mendenhall, 446 US 544 (1980); pero véase también Florida v. Bostick, 501 US 429 (1991).

III

Para recapitular, en este caso tres agentes de la Policía entendieron que hubo sospecha individualizada para detener el vehículo que conducía el señor Henríquez Rivera, en el cual se encontraban el señor Urbáez Mateo y un tercer pasajero. Esto pues los cristales del vehículo aparentaban estar muy oscuros, en posible violación a la Ley de Tránsito, supra. Durante la detención, el agente Arocho Torres percibió que el señor Henríquez Rivera conducía bajo los efectos de

bebidas embriagantes, una infracción tipificada como *delito* al amparo de la Ley de Tránsito, <u>supra</u>. Por ello, entendió que había motivos fundados para arrestar al señor Henríquez Rivera. Posteriormente, hubo un forcejeo entre este último y el agente Arocho Torres en el que se deprendió un arma de fuego de la cintura del señor Henríquez Rivera. Todos los agentes testificaron que al momento de los hechos conocían que el arma que cayó al piso se desprendió del señor Henríquez Rivera. Por lo tanto, podemos determinar que el agente Arocho Torres tenía motivos fundados para intervenir con el señor Henríquez Rivera. Ahora bien, cabe preguntarse si esas mismas circunstancias estaban presentes para intervenir con el señor Urbáez Mateo y si la evidencia que se obtuvo al registrarlo fue producto de un registro legal.

En específico, corresponde determinar si existían elementos suficientes para que una persona prudente y razonable creyera **que la persona a ser arrestada,**[31] **entiéndase**

---

[31] Sin duda, el agente Rivera Vélez efectuó un arresto al señor Urbáez Mateo, por lo que la protección constitucional contra incautaciones y allanamientos irrazonables se activó a favor del acusado tan pronto ocurrió un arresto revestido de ilegalidad. Según vimos, el estándar para determinar si se efectuó un arresto es si, dadas las circunstancias, una persona razonable hubiese creído que no estaba en libertad de poder marcharse del lugar. En este caso, según declaró el agente Rivera Vélez, inmediatamente después de ver caer el arma de la cintura del señor Henríquez Rivera, ordenó al señor Urbáez Mateo que se desmontara del vehículo, lo agarró por el brazo izquierdo y le informó que estaba arrestado. Antes de poder ponerle los grilletes, el señor Urbáez Mateo tensó el brazo izquierdo y se dobló hacia al frente. Acto seguido, el agente Rivera Vélez lo tumbó al suelo y finalmente le puso los grilletes en las muñecas. Mientras, el agente Sánchez Ramos lo ayudó. Ante estas circunstancias, una persona razonablemente pensaría que se le estaba arrestando pues un agente con uniforme y autoridad aparente: (1) le ordenó a salir del vehículo; (2) **lo agarró por el brazo izquierdo y no lo soltó;** (3) **le informó expresamente que estaba arrestado;** (4) en presencia de un segundo agente con uniforme y autoridad aparente, **le restringió la capacidad de movimiento,** y (5) le puso unos grilletes en sus muñecas. Por consiguiente, no cabe sino concluir que agente Rivera Vélez puso al señor

**el señor Urbáez Mateo,** cometió o estaba cometiendo un delito. Esto último **sustentado por la existencia de motivos fundados con respecto a esa persona en particular.** Sobre los motivos fundados para arrestar al señor Urbáez Mateo, el agente Rivera Vélez adujo que estos fueron los siguientes: (1) al señor Henríquez Rivera se le cayó un arma frente a su cuerpo durante el forcejeo entre este y el agente Arocho Torres; (2) cuando comenzó el forcejeo, el pasajero delantero salió corriendo hacia el residencial público que se encontraba próximo al lugar lo que le generó sospecha, y (3) la multitud que le gritaba improperios —pero mirando a la periferia y nunca de frente- lo hizo sentir inseguro.

Un análisis cuidadoso de estos elementos conduce a la conclusión forzosa de que la convergencia de estos no era suficiente para que una persona prudente y razonable creyera que el señor Urbaez Mateo cometió o estaba cometiendo un delito. Según se desprende de la prueba testifical, ninguno de esos tres elementos guarda relación alguna con conducta o

---

Urbáez Mateo bajo arresto antes de realizarle el cacheo y registro por el cual se le ocupó la evidencia que se incautó.

Nótese que el agente Rivera Vélez indicó que, mientras le ponía los grilletes al señor Urbáez Mateo, este ultimo realizó "movimientos laterales" con sus piernas. Adujo que interpretó esa acción como un intento de irse a la huída. Encuentro inverosímil concluir que una persona a quien se le anunció su arresto, se le está agarrando por el brazo y está siendo custodiada por dos agentes de la Policía frente a la puerta de un vehículo proponía marcharse del lugar simplemente porque movió sus piernas con movimientos laterales mientras se bajaba del vehículo, Máxime cuando lo anterior presuntamente ocurrió cuando el señor Urbáez Mateo estaba ante el control total de los agentes. El hecho de que la persona mostrara resistencia al tensar el brazo mientras el agente se proponía ponerle los grilletes tampoco supone la existencia de motivos fundados que justificaran, de manera retroactiva, un arresto que de por sí ya era ilegal. Nada en nuestro ordenamiento jurídico ni en la jurisprudencia federal valida la aplicación de la doctrina de motivos fundados de manera retroactiva.

circunstancias atribuibles al señor Urbáez Mateo. En primer lugar, en cuanto al arma de fuego que se desprendió de la cintura del señor Henríquez Rivera, el agente Rivera Vélez testificó que conocía que esta no guardaba relación alguna con el señor Urbáez Mateo. Sobre el particular, declaró:

> [ABOGADO]: […] Usted dice que vio evidencia delictiva pero la realidad es que la evidencia que, delictiva que usted observó no tenía nada que ver con Yicauri, ¿verdad que no?"
>
> […]
>
> [AGENTE RIVERA]: Directamente relacionada con Yicauri no.[32]

En segundo lugar, con relación a la conducta del pasajero que salió corriendo y la sospecha que esta generó en el agente Rivera Vélez, la jurisprudencia indica que una mera sospecha no constituye motivo suficiente para arrestar a alguien. Pueblo v. Colón Bernier, supra, pág. 144. Además, esa sospecha no podía ser atribuible al señor Urbáez Mateo, quien en todo momento antes de su arresto se quedó sentado en el asiento posterior del vehículo, sin incurrir en conducta sospechosa.[33] Aun si uniéramos este suceso al desprendimiento del arma del señor Henríquez Rivera, estos hechos de por sí

---

[32] Íd., pág. 297.

[33] Esto quedó evidenciado en las admisiones múltiples que hizo el agente Rivera Vélez sobre el comportamiento del señor Urbáez Mateo durante la intervención. Por ejemplo, el agente Rivera testificó:

> [ABOGADO]: No. Y de hecho usted dice […] que él[, Urbáez,] no había cometido ningún delito.
>
> [AGENTE RIVERA]: Bueno, estaba sentado…
>
> [ABOGADO]: Sentado.
>
> [AGENTE RIVERA]: … sin cometer delito sentado en la parte posterior del auto. Correcto.[33]

Íd., pág. 274.

no conectaban de ninguna manera al señor Urbáez Mateo con la creencia razonable de que cometió o cometía un delito. Hasta ese momento, lo único que tenían en común el señor Urbáez Mateo y los dos ocupantes del vehículo era su presencia en el automóvil que los agentes detuvieron.

Resta preguntarnos si el ambiente presuntamente hostil que se suscitó en las cercanías del área durante la intervención creó las circunstancias que justificaran el arresto y registro del señor Urbáez Mateo. La respuesta es que no. Claramente el hecho de que la multitud actuara de una manera hostil no implicó de ninguna manera que el señor Urbáez Mateo cometió o estaba cometiendo un delito. Máxime cuando el Ministerio Público no alegó que el señor Urbáez Mateo fue el responsable de que se suscitara ese ambiente. Por otro lado, validar un arresto sin orden judicial en esas circunstancias sería avalar el arresto y registro de toda persona -independientemente de su conducta- que se encontrara en la cercanía de un intercambio de palabras entre la Policía y ciertas personas en ese grupo únicamente por su presencia en ese lugar. Esa conclusión es absurda. Si bien durante el juicio los agentes declararon que ese ambiente los hizo sentir inseguros, no argumentaron cómo el arresto del señor Urbáez Mateo en esos momentos hubiese disminuido ese efecto.

Finalmente, aunque el agente Rivera Vélez no adujo que esta fuera una causa para arrestarlo, debemos considerar si el hecho de que el señor Urbáez Mateo tenía una cerveza abierta en la mano al momento de la intervención justificaba

un arresto sin orden judicial. Al respecto, el Art. 10.17(f) de la Ley de Tránsito, 9 LPRA sec. 5297, prohíbe el transporte de bebidas embriagantes en envases abiertos en el interior de un vehículo. Sin embargo, ese artículo dispone que su infracción constituye una **falta administrativa** sancionada con la expedición de un boleto de doscientos dólares ($200). Según el Art. 23.03 de la Ley de Tránsito, 9 LPRA sec. 5683, una falta administrativa al amparo de ese estatuto se convertirá en delito menos grave cuando, como consecuencia de la infracción, se causare o contribuyere a causar un accidente que resultare en la lesión de una persona o daños a la propiedad ajena. Aquí no se dieron las circunstancias para que la falta administrativa se convirtiera en un delito menos grave. Por lo tanto, al tratarse de una falta administrativa, un funcionario del orden público no estaba facultado a realizar un arresto al amparo de la Regla 11 de Procedimiento Criminal, supra.

En conclusión, no me queda duda que en este caso se arrestó al señor Urbáez Mateo sin motivos fundados para ello. Por lo tanto, **el cacheo y posterior registro que se le hizo mientras estuvo bajo arresto y esposado en el suelo se realizó sin autoridad en ley para ello y toda la evidencia que se obtuvo fue a raíz de un registro ilegal.** Al amparo de la regla de exclusión que contiene la Constitución, correspondía que se declararan inadmisibles el arma y las sustancias controladas que se le ocuparon luego de su arresto ilegal. Debido a que al señor Urbáez Mateo se le acusó de los

delitos de portación y uso de armas de fuego sin licencia, al amparo del Art. 5.04 de la Ley de Armas, *supra*, y de poseer una sustancia controlada con intención de distribuir, bajo el Art. 401 de la Ley de Sustancias Controladas, *supra*, sin esa evidencia no se podía probar más allá de duda razonable ninguno de los dos delitos por los que se le acusó. En consecuencia, procedía que confirmáramos la Sentencia del Tribunal de Apelaciones en cuanto a absolver al señor Urbáez Mateo. Dado que una mayoría de este Tribunal resolvió lo contrario sobre ese particular, disiento en parte con la totalidad del dictamen.



                                    Maite D. Oronoz Rodríguez
                                       Jueza Presidenta